UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------X
                            :
UNITED STATES OF AMERICA,    :
                            :        05-MJ-618
        v.                   :
                            :        May 16, 2005
GLENN MARCUS,                :
                            :        Brooklyn, New York
                            :
            Defendant.       :
---------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★  MAY 2 4 2005  ★
BROOKLYN OFFICE


TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
BEFORE THE HONORABLE JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:        ROSLYNN R. MAUSKOPF, ESQ.
                           UNITED STATES ATTORNEY
                           BY: DANIEL WENNER, ESQ.
                           ASSISTANT U.S. ATTORNEY
                           225 Cadman Plaza East
                           Brooklyn, New York  11201


For the Defendant:         MILDRED WHALEN, ESQ.


Audio Operator:


Court Transcriber:         ARIA TRANSCRIPTIONS
                           c/o Elizabeth Barron
                           328 President Street, #3
                           Brooklyn, New York 11231
                           (718) 522-2335


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1        THE CLERK:  Criminal cause for detention hearing,

2   case number 05-611-MJ, United States versus Glenn Marcus.

3   Counsel, please state your names for the record.

4        MR. WENNER:  For the government, David Wenner.

5   Good morning.

6        THE COURT:  Good morning.

7        MS. WHALEN:  The Legal Aid Society by Mildred

8   Whalen.  Good morning, your Honor.

9        THE COURT:  Good morning.  This was put over at

10   your request, Ms. Whalen?

11        MS. WHALEN:  Yes, it was, your Honor.  Basically,

12   we closed the last appearance.  I was asking for release on

13   my client's own recognizance.  Judge Mann denied it.  So I

14   put a bail package together and called on Friday to have us

15   come forward.  So it was a permanent order of detention but

16   I put it on the calendar.

17        THE COURT:  Okay.

18        MS. WHALEN:  Your Honor, I do have a bond package

19   here.  I've got my client's parents, Gerard and Belle

20   Marcus.  They are willing to sign the bond.  Ms. Marcus is a

21   housewife.  Mr. Marcus runs a hedge fund, a funds account.

22   They are willing to post their home, which is located at 750

23   Mulberry Place in North Woodmere, New York.  The home has a

24   value of approximately $650,000 to $850,000 and currently

25   has no mortgage.  They've completed a confession of

1   judgment.  All we're waiting for is a bond amount and they

2   will sign it and then immediately file it.

3          Mr. Marcus's roommate Rhona Cohen is also here

4   today.  She's confirming that Mr. Marcus can come back and

5   live with her at their residence.  Mr. Marcus this morning

6   signed an Equifax credit report which shows that he doesn't

7   have any other assets outstanding.

8          Your Honor, I'm in receipt of the government's

9   letter of today, May 16th, arguing that Mr. Marcus is both a

10  risk of flight and a danger to the community, and that there

11  is no set of circumstances that can assure either his

12  appearance in court or the safety of his victim.

13         With respect to risk of flight, I believe that

14  that's now addressed by his parents posting a home of

15  considerable value to secure whatever bond amount that the

16  Court would set, and the fact that his roommate is here.

17  And she was present when he was arrested, when their home

18  was searched, and she is still willing to take him back.  So

19  I think that does demonstrate ties to the community that are

20  in fact substantial.

21         With respect to the issue of dangerousness, the

22  government's only -- the only new fact that the government

23  is alleging in its letter deals with I think the issues that

24  I raised last week about the facts of the case and the

25  issues that are raised in the complaint about this woman and

1    her claim that she was forced here.

2          If the Court has read the complaint, there is an

3    issue of the woman moving several times.  There is an issue

4    of the woman working.  So that a lot of this claim of force

5    I think is going to deal with the psychological claim that

6    he somehow had a hold over her that would require her to

7    return, even though these other things were happening.

8          The government is now claiming on page 2 in the

9    last paragraph that after her escape, which I call into

10   question, the defendant continued to threaten this witness

11   with retribution and threatened to send the web site images

12   of her to the newspapers and to her parents, and that that

13   was a way that she would always be in his service and could

14   never escape from him.

15         Your Honor, I think that this issue of him being a

16   danger to the community can be fully addressed by the

17   witness tampering provisions of any bond that's set.  The

18   Court can impose a condition that he have no contact.  I

19   mean, I've already told him not to have any contact with

20   anyone that he believes is a complaining witness in this

21   case.

22         The Court could ensure that there was no

23   telephonic contact.  The Court could limit his access to

24   computers, and the government could monitor the witness'

25   phone calls.  They could monitor her e-mail accounts.  And

1   if there was any contact from someone alleging to be Mr.

2   Marcus, we could have a hearing to address that.

3          But at this point, given the fact that the

4   allegations are four years old, that they date from 2001;

5   given the fact that even while the allegations were ongoing,

6   there is a real issue about the ability of Mr. Marcus to

7   force this woman into the labor that she claims he forced

8   her into, I think that the bond that's set would be

9   sufficient both to eliminate him as a risk of flight and

10  also would be sufficient, with witness warnings and certain

11  monitoring behavior, for the Court to be convinced that my

12  client would have no access to this witness and could not

13  influence her in any way.

14         THE COURT:  Alright, I'll hear from you again.

15  Let me hear from the government.  This is obviously my first

16  exposure to this case.  I've read the complaint, I've read

17  your letter and the Pretrial Services report.

18         MR. WENNER:  Very well.

19         THE COURT:  What's happened since 2001?

20         MR. WENNER:  With the victim, your Honor?

21         THE COURT:  When did she escape?

22         MR. WENNER:  She escaped in I believe October,

23  2001.

24         THE COURT:  Okay.  And since then --

25         MR. WENNER:  And since then --

1          THE COURT:  -- she has had no contact with him?

2          MR. WENNER:  That is not true.  Since then, she

3    has had contact with him.  He has contacted her.  In

4    addition, she resides near the apartment that I believe he

5    and Ms. Cohen reside at.

6          Aside from that, on the web site, he placed

7    threatening, I guess for lack of a better word,

8    notifications, including a banner of some sort that

9    suggested to those members of his web site, people who

10   viewed it, if you get a picture of this person, let me know

11   and I'll give you free access to my web site.  So not only

12   did he harass her but he also --

13         THE COURT:  I understand.

14         MR. WENNER:  -- I guess invited others to do the

15   same.

16         THE COURT:  And that was when?

17         MR. WENNER:  That was within the past few months,

18   your Honor.  The telephone contact has also been within the

19   past few months.

20         THE COURT:  So there was -- so she escapes or she

21   leaves him.

22         MR. WENNER:  Yes.

23         THE COURT:  She successfully removes herself from

24   his premises.

25         MR. WENNER:  Yes.

1      THE COURT:  In '01.  And then there is this time

2  lag or is this ongoing?  What happens between '01 and '05?

3      MR. WENNER:  With her?

4      THE COURT:  With them.

5      MR. WENNER:  With them.

6      THE COURT:  I mean, is she living in the

7  neighborhood, like you described?

8      MR. WENNER:  My understanding is that she was

9  living in the neighborhood.  Then at some point she

10  contacted the authorities, after I think grappling with what

11  might happen to her.

12      THE COURT:  What date was that, what year?

13      MR. WENNER:  And I believe that the contact with

14  her was in January of 2004, approximately.

15      THE COURT:  But between '01, when she escapes, and

16  '04, she doesn't contact the police.

17      MR. WENNER:  No.  But at the same time, she had

18  been told by the defendant that if she were to contact the

19  authorities, he would undertake efforts to humiliate her by

20  releasing the photographs on the web site to the press as

21  well as to her parents, and other harm would come to her.

22      THE COURT:  And she contacted the authorities in

23  '04.

24      MR. WENNER:  Exactly, in early '04, yes.

25      THE COURT:  Then describe to me what their contact

1  is between '04 and now.  I don't know when it '04 it was.

2        MR. WENNER:  There have been telephone calls.  The

3  defendant has contacted her and they've had whatever

4  discussions, conversations, et cetera, about various things,

5  including her being "in his service," what happened when she

6  was there, things of that nature.

7        THE COURT:  But there was no physical harm to her

8  between '01 and today.

9        MR. WENNER:  That's correct, your Honor, except

10  that from her monitoring of the web site and her repeatedly

11  asking the defendant to remove the images of her from the

12  web site, she felt threatened by him.  She saw the banner

13  suggesting that others should try to find her, seek her out.

14        THE COURT:  But she never moved?

15        MR. WENNER:  No, she did not move.  I would also

16  add, your Honor, aside from that issue, a lot -- a great

17  number of the events that are described in the complaint

18  occurred at the residence where the defendant and Ms. Cohen

19  resided, as well as an event occurred at the home of the

20  defendant's parents.

21        THE COURT:  So what are you arguing?

22        MR. WENNER:  I'm arguing, I suppose, that those

23  premises are not -- they're not, I suppose, safe places.

24  Who knows what he will continue to do at those places?  In

25  addition, your Honor, while supervision of the Court can

1   prevent him at some level from calling her or contacting

2   her, it can only be in the instruction of the Court.  There

3   is nothing the government can do to supervise him at all

4   times.

5           THE COURT:  You can monitor all his phone calls,

6   he can be denied access to a computer, he can be on complete

7   lock-down, house arrest.  I mean, she never moved.  I'm not

8   saying that she should have to move.

9           MR. WENNER:  I understand.

10          THE COURT:  She left him in '01.  This is some of

11  the most shocking behavior that I've ever read.  But under

12  these circumstances, I guess I want to hear you on why the

13  conditions suggested, and perhaps even more, don't ensure

14  her safety.  Then my other question is, is there any threat

15  to any other members of the community?  It all seems to be

16  about this person.

17          MR. WENNER:  Well, your Honor, I think first of

18  all --

19          THE COURT:  I mean, there he is living with a

20  woman who says, he can live with me, I can sign a bond.

21          MR. WENNER:  Right, a woman who, incidentally, was

22  not I think unaware of what was going on at this location.

23  In addition, while this particular --

24          THE COURT:  Well, wait a minute.  Was the proposed

25  suretor in his life in 2000/2001?

1          MR. WENNER:  Ms. Cohen?

2          THE COURT:  Yes.

3          MR. WENNER:  I believe so, yes.

4          MS. WHALEN:  My understanding is that he wasn't

5    living there at the time.

6          MR. WENNER:  I don't know whether --

7          THE COURT:  Living at the residence which is the

8    residence in Kew Gardens.

9          MR. WENNER:  Your Honor, that's part of the

10   problem as well, that the defendant -- he might not have

11   been living there but I don't -- he didn't -- at the time

12   that these allegations in the complaint occurred, he didn't

13   necessarily have a permanent residence, somewhere that he

14   could claim as his own.  In fact, when he was arrested, my

15   understanding is that the residence was his parents' is what

16   he gave.

17         THE COURT:  I understand.  Let me get back to my

18   other question.  Are there any other -- do you have any

19   reason to believe -- do you have any evidence that he

20   conducted himself in this way with respect to any other

21   people?

22         MR. WENNER:  Yes, your Honor.  There was other

23   women in the same circumstances.

24         THE COURT:  Other than one and two.

25         MR. WENNER:  Yes.

1          THE COURT:  Other than one and two.

2          MR. WENNER:  Other than one and two, yes.  I would

3    say conservatively --

4          THE COURT:  And that's from what CW-2 has said.

5          MR. WENNER:  And one, and from images on the web

6    site of other people.

7          THE COURT:  So tell me why the proffered bail

8    package, including conditions such as phone calls monitored

9    other than his lawyer, computer usage, total house arrest,

10   limited visitation, approved list of people he could see --

11   why don't you discuss it with the agent and tell me why you

12   think that's not sufficient to ensure the safety of the

13   victim as well as other potential victims.

14         MR. WENNER:  I think part of the difficulty, your

15   Honor, is for example, no computer usage.  How is that

16   enforced by the Court?  How is that prevented from

17   occurring?

18         THE COURT:  I'll tell you how that's prevented.

19   I've done this in another case.  I arranged to have -- in

20   another very close bail situation like this, Pretrial

21   Services, on Legal Aid's consent, went to the house.  They

22   went, they took -- the defendant in that case offered up any

23   computer equipment he had.

24         Pretrial Services took it and then they were

25   permitted to search the house to make sure there was no

1   other equipment there, and then they were permitted searches

2   as they saw fit to ensure that.  It's been months and months

3   and months and that's been satisfactory.  It was in a

4   situation where children were victims.  That's how it was

5   effectuated.

6           MR. WENNER:  I think in addition, your Honor --

7   just one moment.

8           THE COURT:  Does Pretrial -- do you want to weigh

9   in on this?

10          PRETRIAL SERVICES:  I was going to say, your

11  Honor, that we, as far as monitoring -- I think you said

12  monitoring telephone calls.  We can't really specifically

13  monitor all telephone calls.  We have a curfew program where

14  we can ensure that he'll be in his house at certain hours.

15          THE COURT:  I know the FBI has had bail packages

16  in previous cases -- has monitored calls, haven't you?

17          FBI AGENT:  Your Honor, I've always said that we

18  need a Title III to be doing that.

19          THE COURT:  Well, no.

20          MS. WHALEN:  Your Honor, no.  My experience has

21  been that I've had cases where there are allegations that

22  the threat was made.  While you're not maybe monitoring the

23  person's phone calls, the minute they call and say, I've

24  gotten a call from so and so, your office has the ability to

25  subpoena the phone records and see where the call is coming

1   from and who it's coming from.

2        FBI AGENT:  That's a (ui) register but that

3   doesn't tell you what the conversation is.

4        MS. WHALEN:  At this point, we would be talking

5   bout a no-contact order.  I mean, there wouldn't be any

6   contact, period.

7        THE COURT:  I'm interested to hear from you,

8   because my problem in this case is as disgusting and

9   egregious and vile that everything you've alleged is, it's

10  with respect to a number of people and here I have his

11  family and this woman that he lives with, prepared to sign a

12  very substantial bail package with unbelievably strict

13  conditions.

14       I'm happy to hear you on anything else that would

15  put him in a position where he couldn't have any contact and

16  where there would be no potential for him to have any kind

17  of contract with these alleged victims.

18       MR. WENNER:  Your Honor, insofar as Ms. Cohen is

19  concerned, I think that she would be an improper surety for

20  a couple of reasons.  First, she was present and perhaps a

21  participant in some of the events that occurred.  I would

22  say that this -- the allegations are not simply of physical

23  abuse but also of psychological influence and brain-washing

24  type of activity.

25       I would submit that Ms. Cohen, who has been with

22          MR. WENNER:  He certainly should not be with Ms.

23    Cohen.

24          THE COURT:  No, I think he should be at his

25    parents'.

1   him for a substantial amount of time, has been a participant

2   in these activities, may very well be in that category.

3   Certainly, aside from --

4          THE COURT:  And therefore -- I could have a bond

5   and Ms. Cohen doesn't have to sign it.  It's still a very

6   substantial bond.

7          MR. WENNER:  Absolutely.  That's true, your Honor.

8   I would suggest that that would be the most appropriate

9   thing.  However --

10         THE COURT:  This wouldn't even be a situation

11   where I would suggest that Ms. Cohen be responsible for him

12   complying with the bail conditions.  I want his bail

13   conditions to be so tight that there's no question that he's

14   responsible and the government is looking at him all the

15   time.

16         MS. WHALEN:  And I can even clarify that.  Ms.

17   Cohen is not going to sign the bond.  She financially is not

18   able.  So I had put her forward as he had a place to go back

19   to, but his parents have also indicated that he can stay

20   with them.

21         THE COURT:  I think he should be with his parents.

22         MR. WENNER:  He certainly should not be with Ms.

23   Cohen.

24         THE COURT:  No, I think he should be at his

25   parents'.

1          MR. WENNER:  I suppose --

2          THE COURT:  Tell me -- you've heard my concerns.

3          MR. WENNER:  I have, your Honor.

4          THE COURT:  What do you think that the bail

5    conditions be, beyond what I've suggested?

6          MR. WENNER:  I just -- the fear I have is that I

7    believe that these conditions will address anything that has

8    happened.  What I mean by that is if the defendant has made

9    contact, then by subpoenaing phone records, the government

10   would be able to find that out.

11         The fear, however, that I have is that that's

12   almost too late.  If he were to break the bail conditions in

13   an effort to make contact or something like that, while it

14   is something that the government could perhaps find out

15   about, it's not something that the government can prevent.

16   It's all on his willingness to abide by them.

17         THE COURT:  If it happens once, he's remanded.

18   Here we are in 2005 and this person escaped in 2001.  If it

19   happens one time, he's remanded.  I guess I feel that as

20   awful as these allegations are, the bail package that's been

21   offered with additional conditions really, in my view, does

22   ensure the safety of the community and these victims.

23         MR. WENNER:  The only other issue, your Honor, and

24   this is something -- obviously, because this case has not

25   been indicted yet.  There are forfeiture provisions for the

1   statutes that the government is investigating.

2           THE COURT:  Right.

3           MR. WENNER:  To the extent that some of these

4   activities occurred at this North Woodmere Home, there is a

5   possibility -- I don't know what would happen --

6           THE COURT:  We can discuss that when that

7   possibility arises.

8           MR. WENNER:  Very well.

9           THE COURT:  If the government decides that they

10  want to seek to forfeit the parents' home, that will be a

11  decision that you'll make after due consideration.  Let's

12  discuss the kinds of conditions.

13          MR. WENNER:  Very well.

14          THE COURT:  No computer, no laptop.

15          MR. WENNER:  No computer in the home, no cell

16  phone --

17          THE COURT:  Hold on, one at a time.

18          MR. WENNER:  I'm sorry.

19          THE COURT:  Could you have his parents come up?

20          MS. WHALEN:  Yes.

21          THE COURT:  I want to make sure his parents

22  understand this.  Before we go through this list, let me

23  just say if there is any alleged violation of these bail

24  conditions, there will be no second chance.  It's a very

25  close call here.  Mr. Marcus will be remanded.  There will

1  be no second chance.  He will be brought back to me and

2  you'll have heard me now.  He'll be remanded.

3          So we're talking about -- do you have a computer

4  in your home?

5          MR. MARCUS:  Yes, I do.

6          MS. MARCUS:  Yes.

7          THE COURT:  Do you need to use your computer?

8          MR. MARCUS:  Yes, I do.

9          THE COURT:  Well, that's a problem.

10          (Pause in Proceedings)

11          MR. MARCUS:  What if we monitor him, don't allow

12  him near the computer?

13          THE COURT:  No.

14          MR. MARCUS:  That's not sufficient?

15          THE COURT:  No.

16          MR. MARCUS:  Well, then --

17          THE COURT:  Why can't you just use a laptop and go

18  to a local coffee shop if you have to use the computer?

19          MR. MARCUS:  I'll make do.  What do I have to do,

20  just turn the computer off and pull the plug?  Do I have to

21  take it out of the house?

22          THE COURT:  Yes.

23          MR. WENNER:  Your Honor, I think it would have to

24  be out of the house.

25          THE COURT:  I think it would have to be physically

1   out of the house.

2          MR. WENNER:  To the extent a laptop is used --

3          THE COURT:  Well, the laptop can't be in the

4   house.

5          MR. WENNER:  Right.  Mr. Marcus wouldn't be able

6   to have access to it in the slightest.

7          THE COURT:  No, not the defendant.

8          MR. WENNER:  Right.

9          THE COURT:  Absolutely not.

10         MR. MARCUS:  If those are the conditions, those

11  are the conditions.

12         THE COURT:  Those are the conditions.  No cell

13  phone.  What else?

14         MR. MARCUS:  Wait a minute, no cell phone in the

15  house?

16         THE COURT:  You can have a cell phone.

17         MS. WHALEN:  Mr. Marcus can't have a cell phone.

18         THE COURT:  What do you want to do in terms of the

19  telephone?  How do you want to deal with that, because

20  obviously there is a phone in the house.  Do you want a

21  list?  Do you want to have him agree to give you -- agree to

22  a pen register?  What do you want to do?

23         MR. WENNER:  I think a pen register on the phone,

24  a consensual pen register would have to be done.

25         THE COURT:  Okay.  A pen register on the phone

1    means that the government is permitted to learn the

2    telephone numbers that are being dialed from the home.  Just

3    the telephone numbers, not the content of the calls.

4            MR. MARCUS:  Okay, that's fine.  I don't have a

5    problem with that.

6            THE COURT:  But what is your recommendation with

7    regard to whether the defendant can use the telephone at

8    all?  What's his employment?

9            MR. WENNER:  He doesn't have any.

10           THE COURT:  He doesn't need to use the phone.

11           MR. WENNER:  I don't know that the defendant needs

12   to have access to the telephone but --

13           MS. WHALEN:  I mean, other than to call his

14   attorney.

15           MR. WENNER:  Right.

16           THE COURT:  Yeah.

17           MR. MARCUS:  What about if he wants to speak to

18   his nephews or my brother?

19           MR. WENNER:  What about family contact, his

20   daughter?  He has a very close relationship with his adult

21   daughter.  She's been in contact with me.

22           THE COURT:  Well then, I would suggest that you

23   compile a list of people that you probably would not have

24   any issue with him calling.

25           MR. WENNER:  Exactly.

1       THE COURT:  And he would be permitted to call.  So

2  that when the pen register is reviewed, there isn't going to

3  be --

4       MR. WENNER:  Right.

5       THE COURT:  You're not going to seek remand

6  because he called his nephew.

7       MR. WENNER:  Right.

8       THE COURT:  Alright.  He's going to be on house

9  arrest; random visits by Pretrial Services.  House arrest

10 means he cannot leave the premises, your house, unless he

11 has an emergency medical visit or to come to court or to see

12 his lawyer, and that's it.  That's got to be on notice to

13 Pretrial Services.

14      Do you understand that?

15      MS. MARCUS:  Yes.

16      THE COURT:  That's 24 hours a day and he'll be

17 electronically monitored.  He'll have an electronic bracelet

18 on.  The bond amount is going to be a one-million-dollar

19 bond, secured by your home.

20      MR. MARCUS:  The home?

21      THE COURT:  The home is not -- it's a one-million-

22 dollar bond secured by your home.  If the defendant comes

23 back to court, you're not going to lose anything.  If he

24 does not come back to court, if he flees, the home belongs

25 to the government, and then you would owe the government the

1    balance --

2            MR. MARCUS:  The difference.

3            THE COURT:  -- between what the home could be sold

4    for and a million dollars.  If you have any hesitation about

5    this --

6            MR. MARCUS:  No, I don't have any hesitation.

7            MS. MARCUS:  No.

8            THE COURT:  Because you need to understand this is

9    a very serious case and it's a very close call about whether

10   he's going to be released.  I'm only releasing him under all

11   of these conditions.  A one-million-dollar personal

12   recognizance bond secured by the home.  Do you have the

13   address?

14           MS. WHALEN:  It's 750 Mulberry Place, North

15   Woodmere, New York, 11581.

16           THE COURT:  Do you have a passport?

17           THE DEFENDANT:  No.

18           THE COURT:  Don't apply for a passport.

19           MR. MARCUS:  He's not going to be able to because

20   he can't go out of the house.

21           THE COURT:  I know.  What else?  Do you want to

22   make a list in terms of people who can come to the home,

23   visitors?

24           MR. WENNER:  That's what we were going to say.  I

25   would say family members only.  I don't know what business

1    associates --

2            THE COURT:  Let me hear with respect to --

3            MR. MARCUS:  I mean, we have friends.  I would

4    want my friends to be there, our next-door neighbors.

5            MS. MARCUS:  My sisters.

6            MR. MARCUS:  There are a number of people.

7            THE COURT:  Right.

8            MR. MARCUS:  My brother --

9            THE COURT:  What do you suggest, Ms. Whalen?

10           MS. WHALEN:  I would suggest that the government

11   put together a list of people not permitted.

12           THE COURT:  Alright.

13           MS. WHALEN:  I think that will be easier.

14           MR. WENNER:  That gives me concern, your Honor,

15   because I don't know that --

16           THE COURT:  You don't know if you've identified

17   all the victims.

18           MR. WENNER:  Exactly.  We're still investigating

19   and I would hate to reveal anything.

20           MS. WHALEN:  What I would say is that they would

21   be allowed their family members and their friends.  The

22   government will put together a list of people that they

23   don't want there.  If there later is someone identified,

24   where it becomes an issue, then we can come back to court.

25   But at this point, Mr. Marcus will agree not to have any of

1  his associates from that web site come to the home.

2          THE COURT:  To the extent that friends and family

3  are friends and family of Mrs. and Mr. Marcus, they're

4  permitted to come to the home.

5          MS. WHALEN:  Right.

6          THE COURT:  And I'm sure that the defendant knows

7  these people.  But the defendant is not to have any personal

8  friends come to the home.  Is that clear?

9          MR. WENNER:  Yes.

10          MS. WHALEN:  What about Ms. Cohen?

11          MR. WENNER:  Your Honor, I think that is an area

12  of grave concern for the government.

13          MS. WHALEN:  But, your Honor, I think at this

14  point she is not named as a victim in this case.  She is

15  here -- she's going to be a witness for the defense.  If

16  they're concerned that he's going to somehow exert control

17  on her over statements that she's going to make -- I mean,

18  they could say that about anybody that we call as a witness

19  for the defense.

20          We're going to have to talk to these people.

21  We're going to have to investigate what they observed, what

22  they knew, what they saw.  That's critical in this case,

23  especially when a lot of this is the allegation about

24  whether these acts were consensual or not.

25          MR. WENNER:  Your Honor, if Ms. Whalen would like

1   to speak with these people, she is free to do so.  But that

2   does not mean that Ms. Cohen should be going to Mr. Marcus'.

3            THE COURT:  Ms. Cohen right now is not named in

4   the complaint.

5            MR. WENNER:  She is not, your Honor.  However, she

6   may -- at the time of the arrest of the defendant, she was

7   interviewed by FBI agents and made statements and things of

8   that nature that lead the government to believe that it

9   would be, for lack of a better word, unwise and/or unsafe

10  for her to be in contact with him.  Like I said, if Ms.

11  Whalen wants to meet with her --

12            THE COURT:  Wait.  Who said (ui)?

13            MR. WENNER:  Ms. Cohen made statements to the

14  agents that lead the government to believe that the

15  defendant exerted control over her and exerted a substantial

16  influence in her life.  I think to the extent that Ms. Cohen

17  is aware of other people that were involved in this case,

18  other victims of the defendant, she is in a position to be

19  influenced by the defendant to perhaps involve herself in

20  things that we'd all rather not occur.  If he can't call

21  people, she might be able to call people.  I'm not saying

22  she's going to but --

23            THE COURT:  Do you have any evidence of -- I mean

24  what -- this all is for whether she is -- she is obviously

25  not going to be on the bond but she is a close personal

1   friend of the defendant, and I guess they want to speak to

2   each other.

3            MR. WENNER:  I think she is a close personal

4   friend of the defendant who is aware of the identity of some

5   of the defendant's victims and may, at his behest, be in a

6   position, I think is in a position to exert or carry out

7   directions from him.

8            THE COURT:  Was she involved with him in 2001?

9            MR. WENNER:  Yes, your Honor.

10           THE COURT:  How long have they been together?

11           MR. WENNER:  I think even before -- I think right

12   back to 1998.  That's the other -- even though she has not

13   been --

14           THE COURT:  Wait, Ms. Whalen isn't listening.

15           MR. WENNER:  I'm sorry.

16           THE COURT:  What were you saying?

17           MR. WENNER:  I was going to say in addition, she

18   was present during some of the events that are described in

19   the complaint and that were carried on by the defendant.

20   Merely because she wasn't --

21           THE COURT:  Present?

22           MR. WENNER:  Present.

23           THE COURT:  Present during some of his abuse?

24           MR. WENNER:  Present, yes, your Honor.

25           THE COURT:  You mean in the same physical space or

1    in the same house?

2            MR. WENNER:  Present in the same physical space.

3            THE COURT:  In a position to observe this.

4            MR. WENNER:  I believe so, your Honor.

5        MS. WHALEN:  Your Honor, Ms. Cohen has brought to

6    my attention the fact that she and Mr. Marcus have been

7    friends since they were thirteen years old.  As to the

8    allegations of present, I think that there are really two

9    issues that are going on here.  My client was involved in a

10   sadomasochistic sexual lifestyle and he was open, had a web

11   site about that.

12           Other people -- his parents knew about this.  I

13   mean, other people know that this is -- that he has a web

14   site, that this is what he's involved in, but it doesn't

15   make it illegal.  So the claims of the abuse --

16           THE COURT:  It's illegal if Ms. Cohen is present

17   when a woman is being abused and held against her will.

18           MS. WHALEN:  Yes, if she's --

19           THE COURT:  This is one of the issues that are

20   going to have to be resolved at a trial stage, not today.

21   The question is what kind of interaction or contact can Ms.

22   Cohen have with this defendant, and I may be suggesting it

23   would have to be monitored.

24           MS. WHALEN:  First of all, Ms. Cohen is saying

25   that she is willing to swear that she will have no contact

1    with anyone at Mr. Marcus's direction.  I believe that in

2    other cases, with mob and with other witness-tampering

3    cases, the admonishment not to have contact with witnesses

4    has been extended to the defendant's friends and family.

5    And if the friends and family contact witnesses, that's

6    considered as witness tampering both on their part and on

7    Mr. Marcus's part.  So I think that that can be resolved.

8           But the issues that they're raising in terms of

9    her not being able to have contact with him or having it

10   monitored in some way, I think that the witness-tampering

11   admonishment to her would be sufficient to cover the

12   allegations here.

13          And again, they are just allegations, and the

14   government is coming forward -- you haven't seen a copy of

15   Ms. Cohen's statements.  I haven't and neither has Ms.

16   Cohen.  To make these claims that she's somehow acting under

17   his Svengali presence -- I think that without more, you have

18   to err on the side of freedom.

19          THE COURT:  So you're suggesting that he be

20   permitted to have -- the only contact he could have with her

21   would be if she came to the parents' house.

22          MS. WHALEN:  Right.

23          THE COURT:  And that she be given a strict

24   admonishment with respect to who she talks to.

25          MS. WHALEN:  To not contact anyone at Mr. Marcus's

1  request.  I believe that she here is willing to say she's

2  not going to have any contact with the witnesses on her own

3  initiative.

4      MR. WENNER:  Your Honor, again, this is one of

5  those situations where that is a bell that can't be unrung.

6  It's not something that the government can monitor in

7  advance of it occurring.  It's only something that, if the

8  scenario that the government is concerned about were to play

9  out, if she were to visit Mr. Marcus and he gave her some

10  instruction and then she were to carry it out, only if the

11  person that she contacted was willing to notify the

12  government would we even find about it.

13      If it is some sort of threat or something to that

14  extent, it would be too late.  It would be something that we

15  would never be able to find out about it.  It would be

16  something that we could never undo.

17      MS. WHALEN:  Your Honor, I think that the

18  government could very easily find out about this.  The

19  witnesses could tell him.  I think that my client's ability

20  to exert this influence -- my understanding is that the

21  government has shut the web site down, and his ability to

22  act on this in any way I think can be monitored by the

23  government.

24      There is one clarification that Mr. Marcus's

25  parents have brought to my attention.

```
1         THE COURT:  (Ui).

2         MS. WHALEN:  Right, and they knew he had a web

3    site.  They told me they knew he had a web site.  They

4    didn't understand the content of the web site.  Given that,

5    it was -- there really are issues as to the extent of the

6    allegations and the involuntariness of the allegations.

7         THE COURT:  I'm sure you appreciate that if Ms.

8    Cohen is given explicit direction from me not to have any

9    contact with any potential witnesses in this case, she would

10   be committing a federal crime if she did.

11        MR. WENNER:  You're right, your Honor; that's

12   correct.  But it's a federal crime that obviously would

13   hamper the government's ability to prosecute the defendant.

14        THE COURT:  This is so murky.  This all has to do

15   with whether Ms. Cohen can visit Mr. Marcus in Mr. and Mrs.

16   Marcus's home.

17        MS. WHALEN:  Your Honor, actually, at this point,

18   given the allegations that the government has made and given

19   the fact that the Court is inclined to admonish her --

20        THE COURT:  I think Ms. Cohen ought to make a

21   decision on her own not to visit Mr. Marcus during the

22   pendency of this case.

23        MS. WHALEN:  Well, be that as it may, I think if

24   the Court is going to admonish her, given the accusations

25   that the government has made, she probably needs to have
```

1  someone to advise her, and it can't be me.

2        THE COURT:  No.  Alright, here's what we're going

3  to do.  For purposes of -- for today, the bail conditions

4  are going to be as I've already read into the record.  Ms.

5  Cohen will not be permitted to visit Mr. Marcus.  Ms. Cohen

6  should retain counsel and have discussions with counsel

7  about this issue.  If you want to make another application

8  in the future with regard to it, I'll hear you.  But I think

9  I'm more comfortable with the safety of the community and

10  the witnesses being protected if Ms. Cohen does not have any

11  contact with Mr. Marcus.

12        Do you understand, if your son violates any of

13  these conditions, he's going to be remanded and there aren't

14  going to be any second chances in this case?  And more

15  seriously for you, if he doesn't come back to court, you're

16  going to lose your home and then have a judgment against

17  you.  So you really have to have confidence that he's going

18  to comply.

19        Do you understand that Mr. and Mrs. Marcus?

20        MR. MARCUS:  Yeah.

21        THE COURT:  And you're sure you want to go forward

22  with this.

23        MR. MARCUS:  Yes.

24        MS. MARCUS:  Yes, he's my son.

25        THE COURT:  Because he's going to be living with

1    you.   Do you have any questions about what your obligations

2    are on the bond?

3              MS. MARCUS:   No.

4              THE COURT:   Mr. Marcus, do you understand these

5    conditions:   House arrest, no computer use whatsoever, no

6    cell phone use whatsoever.   There is going to be a pen

7    register on your phone.   You're going to be able to have

8    social interaction with your parents' friends and relatives.

9    Other than that --

10             What are we going to do about the list?

11             MR. WENNER:   Your Honor, I think that if Mr.

12   Marcus is having other than family --

13             THE COURT:   Family and his parents friends.

14             MR. WENNER:   Right.   But having his own friends, I

15   think the government should be notified who those people

16   are.

17             THE COURT:   Why don't you do that?   Then we'll

18   modify the bond after you do that, Ms. Whalen, alright?   And

19   the electronic monitoring -- he's going to have a bracelet.

20             PRETRIAL SERVICES:   Also, what about the

21   possibility of a mental health evaluation and if necessary

22   treatment?

23             THE COURT:   I don't know.   Ms. Whalen, how do you

24   want to proceed with that because you may be doing something

25   on your own.

1        MS. WHALEN:  Actually, I'd like to speak to my

2 client.

3        THE COURT:  Alright.  Let's hold off on that

4 because of the nature of the charges.  You have a confession

5 of judgment executed, right?

6        MS. WHALEN:  I don't have it because we didn't

7 have the amount.  It's all prepared; they can drop it off on

8 the way home.  They will sign it right here in the Court's

9 presence and then we'll fax over to the Court and to the

10 government --

11        THE COURT:  Random home visits.  Do you understand

12 that if there's any violation, however slight, you're going

13 to be remanded?

14        THE DEFENDANT:  Can I ask a question?

15        THE COURT:  Ask Ms. Whalen.

16        MS. WHALEN:  Your Honor, Mr. Marcus was just

17 confirming that the random home visits are during daytime.

18        THE COURT:  They're random; I don't know when they

19 are.

20        MS. WHALEN:  Well, they don't come at 3:00 in the

21 morning, at a time that's unreasonable.

22        THE COURT:  Right.

23        MS. WHALEN:  Do you show up at 3:00 in the

24 morning?

25        PRETRIAL SERVICES:  Not at 3:00.  The earliest

1   I've done is 7:00 a.m.

2            MS. WHALEN:  What's the latest?

3            PRETRIAL SERVICES:  6:00 at night.

4            MS. WHALEN:  Is that acceptable?

5            MS. MARCUS:  That's fine.

6            THE COURT:  Mr. and Mrs. Marcus, let me just tell

7   you, if something occurs or if you get home after this is

8   all in place and you're not comfortable with it, you're not

9   comfortable ensuring that your son is going to comply with

10  this, come back to court.

11           MS. MARCUS:  Thank you.  What can I say?  He's my

12  son.

13           THE COURT:  Anything else?  Do you have a

14  preliminary hearing date?

15           MR. WENNER:  Yeah, we're all set.

16           MS. WHALEN:  Your Honor, we'd actually withdraw --

17  since he's going to be released, we'll withdraw the

18  regarding for a preliminary hearing.

19           THE COURT:  Have the government review the bond.

20           PRETRIAL SERVICES:  Your Honor, in addition to

21  computers and cell phones, that would include any sort of --

22           THE COURT:  Pager --

23           PRETRIAL SERVICES:  Well, any sort of electronic

24  device.  He won't be able to access Blackberries, anything

25  like that.

```
 1              THE COURT:  Does your client have a Blackberry or

 2   a Palm Pilot?

 3              PRETRIAL SERVICES:  Or to the extent that Mr.

 4   Marcus has any of those devices.

 5              THE COURT:  Mr. Marcus, do you have a Blackberry

 6   or a Palm Pilot?

 7              MR. MARCUS:  I have a Palm Pilot but you can't

 8   communicate with it.

 9              PRETRIAL SERVICES:  Okay.

10              MR. MARCUS:  I do have a cell phone.

11              MS. WHALEN:  And you're not going to let your son

12   use it.

13              MR. MARCUS:  No.

14              MS. MARCUS:  I have one, too.

15              MR. WENNER:  The electronic monitoring is in the

16   home, 24 hours.

17              THE COURT:  Except for emergency medical, court

18   appearances or consultation with his attorney.

19              (Pause in Proceedings)

20              THE COURT:  Mr. Marcus, do you have any questions

21   about what your bail conditions are?

22              THE DEFENDANT:  No, I don't.

23              (Tape off, tape on)

24              MR. WENNER:  Your Honor, I'm just putting in that

25   he shall not have contact with any person except family and
```

1   friends of -- is it Gerard and I'm sorry, your name?

2          MS. MARCUS:  Belle.

3          (Tape off, tape on)

4          MR. WENNER:  Your Honor, in terms of whether

5   there's a travel restriction, it's duplicative --

6          THE COURT:  He's on house arrest, so travel is

7   restricted to within the confines of his house.

8          MR. WENNER:  Right.

9          THE COURT:  Does anybody have any questions about

10  this bail bond?

11         MR. MARCUS:  No.

12         THE COURT:  Does everybody understand all the

13  conditions?

14         MS. MARCUS:  We know.

15         THE COURT:  Okay, thank you.

16         *  *  *  *  *  *  *  *  *  *  *  *

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a correct transcript

19     from the electronic sound recording of the proceedings in

20     the above-entitled matter.

21

22

23     *[signature]*

24

25     ELIZABETH BARRON                          May 20, 2005