# SERCARZ & RIOPELLE, LLP

CARNEGIE HALL TOWER
152 WEST 57TH STREET, 24TH FLOOR
NEW YORK, NEW YORK 10019
(212) 586-4900
FACSIMILE (212) 586-1234
www.sercarzandriopelle.com

ROLAND G. RIOPELLE
MAURICE H. SERCARZ*

———

JULIA L. GATTO*
BRUCE SEELIGER*
  *ADMITTED IN NY & NJ

March 26, 2007

**<u>Via Facsimile and ECF</u>**

The Honorable Allyne R. Ross
United States District Court Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York   11201

> ### Re:    *<u>United States v. Glenn Marcus, S-1 05 Cr. 0457 (ARR)</u>*

Your Honor:

Glenn Marcus respectfully submits this letter in support of his post trial motions.  As is indicated below, Marcus now renews his motion made at the close of the government's case, (Tr. 610-615), and at the end of all of the evidence, (Tr. 1017), for the entry of a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and also moves for a new trial on the above-referenced charges pursuant to Federal Rule of Criminal Procedure 33.

As an initial matter, the statutes under which Marcus was prosecuted and convicted were never intended to regulate the type of conduct involved in this case.  The statutes were enacted to prosecute individuals involved in the international sex and forced labor trade; not to regulate conduct within an intimate, domestic relationship.

In connection with Count One, we also move for a judgment of acquittal, or in the alternative a new trial, because the evidence at Marcus' trial did not establish that the complainant engaged in a "commercial sex act" as that term is defined by the statute and relevant case law.

Furthermore, the jury's verdict on both Counts One and Two should be vacated.  Even if the statutes can be interpreted broadly enough to include the type of conduct at issue here, the government failed to establish a crucial element of both

The Honorable Allyne Ross
March 26, 2007
Page 2 of 24

offenses; namely, that the purpose of the violence inflicted upon or threats made against the complainant by Marcus was to cause the complainant to engage in a commercial sex act or to obtain her labor or services. At best, the government established that Marcus employed violence and threats against the complainant in order to maintain his sexual relationship with her but <u>not</u> to coerce her into posing for or working on his website.

Alternatively, we respectfully move for a new trial. It is now clear that in a case involving such a novel application of the statutes and graphic testimony about an unfamiliar and disturbing lifestyle, the Court must instruct that in order to convict, the jury must find that the <u>dominant</u> purpose of the violence and/or threats employed by Marcus against the complainant was to cause her to engage in a commercial sex act (Count One) or to obtain her labor or services (Count Two).

## <u>Legal Standards</u>

We are mindful that in deciding a Rule 29 motion, the court must resolve all inferences in favor of the prosecution, and view the proof in the light most favorable to the government. <u>United States v. Mariani</u>, 725 F.2d 862, 865 (2d Cir. 1984). The Court should not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence. <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000); <u>United States v. Cunningham</u>, 723 F.2d 217, 232 (2d Cir. 1983). However, the Court must grant the motion "if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." <u>United States v. Taylor</u>, 464 F.2d 240, 243 (2d Cir. 1972).

In deciding a Rule 33 motion, the Court has broad discretion to set aside a guilty verdict and order a new trial to avert a perceived miscarriage of justice, where the evidence of guilt was legally insufficient, or where the jury has reached a seriously erroneous result. <u>See</u> <u>United States v. Ferguson</u>, 246 F.3d 129, 133 (2d Cir. 2001); <u>United States v. Landau</u>, 155 F.3d 93, 104 (2d Cir. 1998) (new trial was properly ordered where court was "convinced that the jury … reached a seriously erroneous result"). Indeed, a Court may properly order a new trial pursuant to Rule 33, even where it does not enter a judgment of acquittal pursuant to Rule 29. <u>See</u> <u>United States v. Autori</u>, 212 F.3d 105, 121 (2d Cir. 2000).

## <u>Facts</u>

The evidence at trial viewed in the light most favorable to the government established the following:

The Honorable Allyne Ross
March 26, 2007
Page 3 of 24

### A.   Marcus and The Complainant Admittedly Were Involved in a Consensual Living Arrangement Built Around BDSM (January 1999 – October 1999)

Marcus and the complainant were in a consensual BDSM relationship from January 1999 to October 1999. (Tr. 170). When the complainant joined the relationship with Marcus she had an understanding of the general nature of BDSM relationships. She understood that in BDSM relationships one party plays the role of the submissive and the other party plays the role of a dominant. (Tr. 229). The submissive "serves" the dominant. The dominant inflicts pain upon the submissive for the enjoyment of both parties. (Id.). For the complainant, at the start of her BDSM relationship with Marcus, she was attracted to the idea of pain and the concept of service. (Tr. 230, 276).

Before embarking on their relationship, the complainant traveled across the country on two occasions to meet with Marcus for several days. (Tr. 252, 260). During these visits, she participated in various forms of painful, sadomasochistic behavior. Marcus whipped the complainant, carved the word "slave" into her abdomen, and engaged in breath play in which he intermittently cut off the complainant's air supply. (Tr. 76-78). The two also had intercourse which incorporated aspects of bondage, including restraint, whipping, and choking. (Tr. 90).[1]

After returning home from the second visit, the complainant wrote a petition to Marcus in which she stated:

> I am begging you to please allow me to be your slave. …
> If you permit me to be your slave, I will obey you without hesitation and with complete joy and gratitude. If I fail to do this, I will beg you to punish me and be grateful for whatever you deem appropriate. I am begging to serve you, sir, completely, with no limitations.

(Tr. 271).

Thereafter, the complainant and Marcus began a "24/7" BDSM relationship. Dr. Charles Moser, who testified as an expert on BDSM, explained that in "24/7" BDSM relationships the parties participate in what is called "total power exchange" or "TPE." (Tr. 881). In a TPE relationship, the submissive "voluntarily decides that they want all of the power to be transferred to the … dominant partner. … [T]herefore, they want the person, the dominant, *to control and make all of the decisions*." (Id.) (emphasis added).

---

[1]      With the complainant's knowledge and consent, Marcus took photographs of their activities and posted the pictures on a website. (Tr. 91, 92). The complainant, at the direction of Marcus, also wrote diaries about her experiences. (Tr. 91-92).

The Honorable Allyne Ross
March 26, 2007
Page 4 of 24

          In addition to participating consensually in activity in which Marcus inflicted pain upon her, the complainant also "served" Marcus by allowing him to control the daily aspects of her life.  For example, when Marcus would visit the complainant, she wasn't allowed to wear clothing or to eat, drink, or speak unless Marcus granted permission.  (Tr. 88).  She wasn't permitted to use the phone without Marcus' permission.  (Tr. 250).  Nor was she permitted to attend religious services, (Tr. 192) or to use birth control, (Tr. 209).

## B.     During Their Relationship, "Punishment" Was a Catalyst for Sexual Activity

          From the onset of their BDSM relationship, as the complainant's petition confirms, the concept of punishment played a significant role in Marcus and the complainant's interactions.  The complainant testified "I was punished just about every time I saw [Marcus] for something," (tr. 97), and explained that "I was always being punished for being disobedient and it could be for no reason at all," (tr. 207).  Early in the relationship, Marcus would punish the complainant by whipping her or placing her in a cage.  (Tr. 96).  A few months into the relationship, the punishments progressed beyond whippings and restraint.  (Tr. 98).

          Punishments were administered whenever the complainant failed to please Marcus.  For example, the complainant recalled that early in the relationship, Marcus imposed a punishment because he did not think she played a musical piece on her keyboard well enough.  (Tr. 336).  The complainant was punished when she appeared depressed to Marcus.  (Id.).  If she failed to smile in a picture, she would be punished.  (Tr. 85).  If her diaries were not written in a specific way, she would be punished.  (Tr. 324).  When Marcus learned that the complainant had burned herself with cigarettes, he administered punishment.  (Tr. 99).

          Marcus also administered punishments if the complainant failed to abide by his rules.  (Tr. 96-97).  Even when the complainant was not in Marcus' presence, the complainant was required to recite, once a day, a list of eighty-two items that were referred to as "Master's Expectations."  (Tr. 94-95).  She was supposed to run cold water and thank Marcus for one minute after her shower.  (Tr. 95).  Sometimes, Marcus instructed the complainant to wear clamps on her breasts or insert a "butt plug" into her anus for long periods of time.  (Id.).  If Marcus learned that any of the rules were not followed, the complainant would be punished.  (Tr. 96).

          The complainant testified that "punishments," like those described above, were part of the sexual aspect of their relationship.  As an initial matter, the complainant testified that "sex took place during different punishments [Marcus] was administering" and that she found these activities "sexually gratifying."  (Tr. 90).  Furthermore, she explained that the punishments, themselves, were sexual.

The Honorable Allyne Ross
March 26, 2007
Page 5 of 24

> Q.    And, what we may call punishment or what some outsider may
>       view as punishment, was, in fact, either foreplay or sex itself to
>       you, isn't that correct?
>
> A.    In the beginning, yes, there were times when that occurred.

(Tr. 277).

Dr. Moser elaborated that generally in BDSM relationships pain and punishment are sexual in nature.  (Tr. 873 – 878).

> Q.    Is there a role for what is commonly referred to as punishment in
>       BDSM?
>
> A.    Yes.
>
> Q.    Tell the ladies and gentlemen of the jury how that fits into the
>       concept of BDSM?
>
> A.    Again, we go back to this as being exchange of power.  If there is a
>       violation of whatever the rule is, then there has to be a
>       consequence for that, and that consequence is punishment.  And
>       some people find that punishment to be arousing.  In some cases it
>       is because the person is aroused by the punishment, by the
>       spanking.  In some cases the person is not aroused by the spanking,
>       but they are aroused by the fact that the person can actually make
>       them do what they want.  So it is the exchange of power that is the
>       actual arousal part.  And in some cases the punishment is – the
>       actual spanking is not arousal at all but reinforces the roles that
>       they have adopted; they have adopted voluntarily.

(Tr. 878).

## C.    Even When the "Punishment" Allegedly Became "Non-Consensual," It Remained a Part of Their Living Arrangement

In October 1999, Marcus subjected the complainant to a punishment for her failure to recruit her sister to join Marcus' submissives and to find a slave to train online.  (Tr. 104).  Although the complainant initially consented to participating in the punishment, she changed her mind.  (Tr. 104-106).  According to the complainant, she told Marcus that she wanted to leave.  Marcus responded by inserting a whiffle ball in her mouth and securing it with needles, whipping and beating her, attempting to sew her vagina, and carving his initials into her feet.  (Tr. 106-107).

The Honorable Allyne Ross
March 26, 2007
Page 6 of 24

        After this incident, the complainant testified that she no longer voluntarily
participated in a BDSM relationship with Marcus.  (Tr. 17).  Marcus, however, continued
to administer punishments.  (Tr. 150-151; 154; 155; 156; 161-167).  According to the
complainant, these punishments were not part of a consensual relationship but, instead,
were acts of nonconsensual violence.  Dr. Moser testified, however, that the conduct
described by the complainant as nonconsensual was consistent with the activities in
which participants of a BDSM lifestyle routinely and willingly engage.  (Tr. 873 - 876).
The clear inference is that Marcus continued to administer punishment as part of an effort
to maintain the relationship and because the behavior was sexually gratifying to him.

**D.      Marcus' Alleged Acts of Violence and Threats had Little, if
         any, Relationship to the Complainant's Work on the Website**

        The complainant testified that after October, 1999, Marcus instructed her
to create and manage a website – slavespace.com.  (Tr. 143, 148, 323).  According to the
complainant, she worked on the website "at least eight to nine hours a day" by uploading
photographs and diaries and by "clicking on links to get slavespace higher on top lists
and also to click on things to try to get more money for [*sic*] advertisers."  (Tr. 148-149).
The complainant also testified that she was required to write diaries that were posted on
the website.  (Tr. 91-92).  According to the complainant's testimony, she did not want to
work on the website but did so because she "was terrified."  (Tr. 149).  The complainant
speculated that if she did not work on the website she "would have been punished
severely."  (Id.).

        However, the complainant testified to only one instance in which
"punishment" related to her work on the website – an incident in which Marcus inserted a
safety pin into the complainant's labia.  (Tr. 150).  Other than testifying that the
punishment was imposed "because of the job [she] was doing on the website," the
complainant offered no further explanation as to why it took place.  In contrast, Rona,
who was present during the incident, testified that the episode was not punishment; but
simply was part of another photo shoot to produce pictures that would be posted on
Marcus' website.  (Tr. 694).  The photographs that were taken included images of Rona
and the complainant engaging in sexual activity.  (Government's Exhibit 2B, pp. 1861-
1872).

        The complainant did not link any of the other episodes of punishment or
violence she described to her work on the website.  When questioned about an incident in
which Marcus inserted needles in the complainant's breast, AUSA Chen asked "Do you
recall what you were being punished for" to which the complainant responded "I don't
recall at the time."  (Tr. 155).

        The complainant testified that punishment was administered on other
occasions because she expressed a desire to leave Marcus and their BDSM relationship.
(Tr. 105-107; 160).  Similarly, the threats Marcus purportedly made regarding publicizing
the complainant's photos were not made in connection with the complainant's work on

The Honorable Allyne Ross
March 26, 2007
Page 7 of 24

the website or in the photo shoots but were made after the complainant told Marcus that she was unhappy in the relationship and that she no longer wanted to be in it.  (Tr. 158-159).  More specifically, the complainant asserted that Marcus threatened to release her photos is she did not go out with him socially to a bowling alley and a strip club.  (Tr. 175).

           The government did not introduce any other evidence that established or even suggested that the safety pin episode or <u>any</u> other punishment was related, in any way, to the work the complainant performed for the website.  Most notably, in the lengthy telephone recordings that were secretly made of Marcus by the complainant and introduced at trial, there was no discussion or suggestion that the complainant ever endured punishments in connection with the work she performed for the website.  (Government's Exhibits 26-28).

**E.      The Relationship Continued After the**
**          Complainant Ceased to Work on the Website**

           The complainant testified that the March 2001 punishment in which Marcus abused her in Sherry's basement was the "last punishment" she endured.  (Tr. 164-167, 365).  After that, the complainant explained, "[Marcus] became less and less extreme and it just eventually I began to talk more about how I couldn't serve him …."  (Tr. 173).  A few months after the incident in the basement, the complainant moved to a new apartment and, by September 2001, she lived by herself in an apartment in Queens where she remained for approximately four years.  (Tr. 172, 339).  In the complainant's words, by then she had "left Mr. Marcus."  (Tr. 342).  The complainant did not testify that after she left Marcus she continued to work on his website.[2]

           Although the complainant no longer "served" Marcus in the context of a BDSM relationship and no longer worked on his website, she continued to have contact with him.  (Tr. 340).  During the period of time the complainant lived independently, she entertained Marcus, his daughter, and son-in-law in her apartment.  (<u>Id</u>.).  She continued to pose in sexually explicit, BDSM-themed photos for Marcus, including pictures depicting the complainant urinating into a bowl.  (Tr. 347-350, Defendant's Exhibits G-1 through G-5).  During these photo shoots, the complainant was not fearful or terrorized by Marcus.  (Tr. 349).  She even accompanied him on camping trips, including a trip in 2002 during which she posed for Marcus, once again, in sexually explicit photo shoots.  (Tr. 363-, Defendant's Exhibits H1 – H5).  Again, she was not coerced to take these photos and she was not in terror when they were taken.  (Tr. 364).

           The complainant testified that in 2003 she asked Marcus to remove any photos of her from his website.  (Tr. 351).  Marcus refused.  (Tr. 352).  In 2004, the complainant consulted a lawyer.  (<u>Id</u>.).  The complainant admitted that she went to the lawyer at that time because she was thinking about obtaining a teaching job and was

---

[2]      Instead, she worked on her own BDSM-themed website.  (Tr. 342-347).

The Honorable Allyne Ross
March 26, 2007
Page 8 of 24

concerned that if someone stumbled upon her photos on the internet it could jeopardize her career in childhood education. (Tr. 353).  The lawyer referred her to the FBI.  (Tr. 354).  Her first visit with the FBI was in April, 2004 – close to three years after the complainant testified she endured her "last punishment."  (Tr. 355).  In May of the following year, Marcus was arrested on the instant indictment.

## <u>Argument</u>

## <u>POINT I.</u>

## COUNTS ONE AND TWO MUST BE DISMISSED BECAUSE THE STATUTES WERE NOT ENACTED TO PROSECUTE THE CONDUCT AT ISSUE IN THE INSTANT CASE

**A.      The Legislative History of 18 U.S.C. §§ 1589 and 1591**

Both the forced labor statute 18 U.S.C. § 1589 and the sex trafficking statute 18 U.S.C. § 1591 were enacted as part of Public Law 106-386 also known as the Trafficking Victims Protection Act of 2000 ("TVPA").  An examination of (1) the precursors to the current legislation; (2) the content of the current legislation; and (3) subsequent legislation reveals that these two statutes were part of a broader legislative scheme which was intended to combat the international problem of sex trafficking.  The legislation was adopted in response to a United Nations protocol, enacted in the same year, which aimed to provide a comprehensive international approach to the trafficking problem.  The statutes were part of a package which provided not only criminal penalties but comprehensive assistance to those who were uprooted from their home countries by trafficking schemes.  Finally, the evil which the statutes were designed to prevent involved the organized exploitation of vulnerable individuals – primarily, women and children – as a business.

**1.      Precursors To The Current Legislation**

In 1910, the United States Government passed the White Slave Traffic Act (the "Mann Act") which has been this country's principal law against such involuntary servitude.  <u>See</u> 18 U.S.C. § 2421-2424 (enacted in CH 395, 36 Stat. 825 (1910))(codified as amended at 18 U.S.C. § 2421-2424 (1998)).

The current version of the Mann Act is, in some respects broader than the statutes at issue.  It punishes both transportation (18 U.S.C. § 2421) and the knowing use of coercion or enticement (18 U.S.C. § 2422) in order to cause an individual to travel in interstate or foreign commerce either (1) to engage in prostitution; or (2) to engage in "<u>any sexual activity for which any person can be charged with a criminal offense</u>."  <u>See</u> 18 U.S.C. § 2422 (emphasis supplied).

The Honorable Allyne Ross
March 26, 2007
Page 9 of 24

Then, in 1994, Congress enacted the Violence Against Women Act ("VAWA").  See Pub.L.No. 103-322, codified as 8 U.S.C. §§ 1151, 1154, 1186 (a), 1229, 1254-55 (1994).

The VAWA was enacted to help undocumented battered women file residency applications and petitions more easily.  See Kumar "Reinforcing Thirteenth and Fourteenth Amendment Principles In The Twenty-First Century: How To Punish Today's Masters And Compensate Their Immigrant Slaves," 58 Rutgers Law Review, 303.  The VAWA allows victims of sex trafficking to obtain permanent residence without having to rely on the cooperation of their abusive spouse.  To self petition under the VAWA, the applicant must first demonstrate that she (1) entered her marriage in good faith; (2) currently resides in the United States; (3) has been the victim of extreme cruelty during the marriage; (4) would suffer severe hardship if deported; (5) has good moral character; and (6) has lived with her spouse in the United States.  See Kumar, supra.

Meanwhile, the United Nations adopted a series of conventions meant to address the worldwide problem of trafficking persons for the purpose of exploitation and prostitution.  See Nelson "Sex Trafficking And Forced Prostitution: Comprehensive New Legal Approaches" 24 Houston Journal of International Law 551.  Thus, in 1949, the U.N. General Assembly adopted the convention for the suppression of the trafficking persons and of the exploitation of the prostitution of others.  (December 29, 1949, 96 U.N.T.S. 271)("1949 Convention")  Article One provides punishment for any person who "procures, entices or leads away, for purposes of prostitution, another person" or "exploits the prostitution of another person, even with the consent of that person."  See 1949 Convention at 274.  Article Sixteen of the 1949 Convention is the Social Welfare provision.  States agree to take educational, health, social and economic measures to prevent prostitution and to "rehabilitate" victims of prostitution.  See 1949 Convention at 280.  States must also protect emigrants and immigrants and warn them of the danger of trafficking of persons.  Id. at 282.  Finally, States agree to repatriate persons who desire to be repatriated or persons "whose expulsion is ordered in conformity with the law."  Id. at 282.

Because the 1949 Convention proved ineffective in dealing with the worldwide problem of trafficking, in November 2000, the U.N. General Assembly adopted the Protocol To Prevent, Suppress And Punish Trafficking In Persons, Especially Women And Children. (G.P.A. Res. 55/25, U.N. GAOR, 55th Sess, Annex II U.N. Doc. A/55/25 (2000)(hereinafter "Trafficking Protocol").  The Trafficking Protocol aimed to provide a "comprehensive international approach" to the trafficking problem by punishing the traffickers and aiding their victims. (Trafficking Protocol at 31).  Article Five called on States to criminalize "trafficking in persons" and the organization or direction of others in this endeavor.  (Trafficking Protocol at 33).  "Trafficking in persons" is defined as:

> The recruitment, transportation, transfer, harboring or
> receipt of persons, by means of the threat or use of force or

The Honorable Allyne Ross
March 26, 2007
Page 10 of 24

> <u>other forms of coercion</u> of abduction, of fraud, of deception, of the abuse of power, or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person for the purpose of exploitation. <u>Exploitation shall include</u>, at a minimum, the exploitation of the prostitution of others or forms of <u>sexual exploitation, forced labor or services</u>, slavery or practices similar to slavery, servitude or the removal of organs.

<u>Id.</u> at 32. (Emphasis supplied).

      The definition of "trafficking" contained in the protocol is strikingly similar to the requirement in the sex trafficking statue that the defendant "knowingly … recruits, entices, harbors, transports, provides or obtains by any means a person," as well as the requirement that "force, fraud or coercion" be used to cause the person to engage in a commercial sex act. <u>See</u> U.S.C. § 1591. The "exploitation" which the protocol seeks to prevent includes "prostitution" and other forms of "sexual exploitation," which are the subject of 18 U.S.C. § 1591 and "forced labor or services" which is the subject of 18 U.S.C. § 1589.

      Article Six of the Trafficking Protocol requires states to assist victims of trafficking by keeping their identities confidential, and by providing them with information regarding legal proceedings and victim's assistance programs as well as by providing physical protection and ensuring that domestic law allows recovery for trafficking victims. <u>Id.</u> at 33-34.  Article Nine mandates that States adopt prevention measures including trafficking awareness campaigns and measures to "alleviate the factors that make persons, especially women and children, vulnerable to trafficking such as poverty, underdevelopment and lack of equal opportunity. <u>Id.</u> at 35. <u>See</u> <u>also</u> Nelson, <u>supra</u>.

**2.**      **The Current Legislative Scheme**

      With this as a backdrop, and in response to the clear mandate of Article Five of the United Nations Protocol enacted the same year, Congress passed the Victims of Trafficking and Violence Protection Act of 2000. The Act delineated a series of new crimes and enhanced penalties for existing crimes.  The new crimes included forced labor (18 U.S.C. § 1589), trafficking with respect to peonage, slavery, involuntary servitude or forced labor (18 U.S.C. § 1590), sex trafficking of children or by force, fraud or coercion (18 U.S.C. § 1591) and unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude or forced labor (18 U.S.C. § 1592). Again, in response to the mandate of the United Nations, the statute went much further than to enact new criminal laws to prevent trafficking.  The TVPA makes trafficking victims eligible for federally funded or administered health and other benefits and services as if they were refugees.  Furthermore, the Act provides for assistance to foreign

The Honorable Allyne Ross
March 26, 2007
Page 11 of 24

countries to draft "laws to prohibit and punish acts of trafficking and to strengthen investigation and prosecution of traffickers." <u>See</u> Buckwalter, et. al., Symposium: Modern Day Slavery In Our Own Backyard, 12 <u>William and Mary Journal of Women and The Law</u> at 403.

       The conference report on HR 3244, the Victims of Trafficking And Violence Protection Act of 2000, listed 24 congressional findings in support of the need for legislation.  The first 5 findings describe the criminal activity which the statutes were intended to punish in terms that demonstrate the international dimensions of the problem. They read as follows:

> (1) As the 21st century begins, the degrading institution of slavery continues throughout the world.  Trafficking in persons is a modern form of slavery, and it is the largest manifestation of slavery today.  At least 700,000 persons annually, primarily women and children, are trafficked within or across international borders.  Approximately 50,000 women and children are trafficked into the United States each year.
>
> (2) Many of these persons are trafficked into the international sex trade, often by force, fraud, or coercion.  The sex industry has rapidly expanded over the past several decades.  It involves sexual exploitation of persons, predominantly women and girls, involving activities related to prostitution, pornography, sex tourism, and other commercial sexual services.  The low status of women in many parts of the world has contributed to a burgeoning of the trafficking industry.
>
> (3) Trafficking in persons is not limited to the sex industry. This growing transnational crime also includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide.
>
> (4) Traffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities in countries of origin.  Traffickers lure women and girls into their networks through false promises of decent working conditions at relatively good pay as nannies, maids, dancers, factory workers, restaurant workers, sales clerks, or models.  Traffickers also buy children from poor families and sell them into prostitution or into various types of forced or bonded labor.

The Honorable Allyne Ross
March 26, 2007
Page 12 of 24

(5) Traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable.

In the Senate, several senators commented for the record on the conference report. See 146 Cong.Rec. S10164-02. Their statements define the conduct against which the new criminal statutes were directed. Thus, Senator Brownback commented, in part, as follows:

This legislation is our best opportunity to challenge the largest manifestation of slavery worldwide, known as "trafficking." This practice of trafficking involves the coercive transportation of persons into slavery-like conditions, primarily involving forced prostitution, among other forms of slavery-like conditions.

Trafficking is the new slavery of the world. These victims are routinely forced against their will into the sex trade, transported across international borders, and left defenseless in a foreign country. This bill also addresses the insidious practice known as "debt bondage," wherein a person can be enslaved to the money lender for an entire lifetime because of a $50 debt taken by the family for an emergency. This is a common practice in countries throughout the South Asian region.

This bill challenges the myriad forms of slavery including sex trafficking, temple prostitution, and debt bondage, among other forms.

Senator Wellstone stated:

Our government estimates that 2 million people are trafficked each year. Of those, 700,000 women and children, primarily young girls, are trafficked from poor countries to rich countries and sold into slavery, raped, locked up, physically and psychologically abused, with food and health care withheld. Of those, as many as 50,000 immigrants are brought into the United States each year, and they wind up trapped in brothels, sweatshops, and other types of forced labor, abused and too fearful to seek help.

The Honorable Allyne Ross
March 26, 2007
Page 13 of 24

Traffickers exploit the unequal status of women and girls, including harmful stereotypes of women as property and sexual objects to be bought and sold. Traffickers have also taken advantage of the demand in our country and others for cheap, unprotected labor.

Senator Boxer offered the following justification for the statute:

I appreciate the work of Senator Wellstone and Senator Brownback on the Trafficking Victims Protection Act. We know that some of these victims have been subjected to the most horrific lives, including rape, sexual abuse, torture, starvation, and imprisonment. The selling of naïve and desperate women into sexual bondage has become one of the fastest growing criminal enterprises in the global economy. It is hard to understand how this could happen. But when people are in a strange land and are frightened, they look to others to protect them when they really want to hurt and harm them. This legislation authorizes $94 million over 2 years to stop this abhorrent practice.

Senator Mikulski offered the following comment:

Today we have two pieces of legislation pending: One, the reauthorization of the Violence Against Women Act, and the other will break new ground to protect women and children who are bought and sold around the world as if they were commodities. They are victims of predatory behavior.

3.      **Subsequent Legislation**

In 2003, Congress passed the Trafficking Victims Protection Reauthorization Act of 2003. H.P.R. Rep. 108-264 (I). The purpose of the Act was to amend the prior legislation and to appropriate funds for fiscal years 2004 and 2005 for the Trafficking Victims Protection Act of 2000. The bill includes new initiatives and modifications in order establish border interdiction programs, international media programs and travel initiatives. The legislation also classified human trafficking offenses as actionable under federal racketeering statutes. Finally, it created prohibitions on the use of funds to promote, support or advocate the legalization or practice of prostitution as well as to require an organization receiving funds to indicate that the organization does not promote, support or advocate the legalization or practice of prostitution. See Buckwalter, supra.

The Honorable Allyne Ross
March 26, 2007
Page 14 of 24

     **4.**     **Conclusion**

     In sum, the enactment of the statutes at issue was undertaken in order to create a comprehensive response to the problem of international slave trafficking.  <u>See</u> Kumar, <u>supra</u>.  The legislation included not only criminal sanctions but public welfare legislation clearly designed to aid victims of international trafficking and reduce America's participation in the global trade in prostitution and other forms of forced labor.

     When viewed in this context, it is clear that the evil which the criminal statutes at issue sought to remedy is a far cry from acts of violence and abuse that take place in the context of an intimate personal relationship.

**B.**     **Principles of Statutory Construction Require that
the Charges Against the Defendant be Dismissed**

     **1.**     **The Rule of Lenity**

     In <u>Bell v. United States</u>, 349 U.S. 81 (1955), the United States Supreme Court established the following principle of statutory construction:

> When Congress leaves to the judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity.  And this is not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or antisocial conduct.  It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment.

349 U.S. at 83.

     To invoke the rule, it must be established that there is a "grievous ambiguity or uncertainty" in the statute.  <u>Staples v. United States</u>, 511 U.S. 600, 619 n.17 (1994)(quoting <u>Chapman v. United States</u>, 500 U.S. 453, 463 (1991)).

     The rule of lenity is called into service to protect the constitutional right to fair warning:  "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal …." <u>Liparota v. United States</u>, 471 U.S. 419 (1985).

     As the Supreme Court has explained:

> There are three related manifestations of the fair warning requirement.   First,  the  vagueness  doctrine  bars enforcement of a statute which either forbids or requires the

doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second, as a sort of junior version of the vagueness doctrine, *the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered*. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed within its scope. In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.

United States v. Lanier, 520 U.S. 259, 266-67 (1997)(emphasis added)(citing, inter alia, Koender v. Lawson, 461 U.S. 352, 355-57 (1983), and Bouie v. City of Columbia, 378 U.S. 347, 353-54 (1964)).

## 2.    The Need To Look Beyond The Language Of The Statutes

The government, no doubt, will argue that resort to the rule of lenity is unnecessary when the "plain meaning" of the language of the statute is clear. However, courts have looked beyond the words of the statute to the legislative history and the logic of the statutory application sought by the government in instances where there is no apparent ambiguity in the words of the statute.

For example, while the words of the statute are clear as a general matter, a particular application of the statute may cast the meaning of the statutory language into doubt.

Thus, in Williams v. United States, 458 U.S. 279 (1982), the Supreme Court was called upon to determine the meaning of the term "false statement" in the context of 18 U.S.C. § 1014 which punishes "whoever knowingly makes any false statement or report, or willfully over values any land, property or security, for the purpose of influencing in any way…" certain federal agencies. The defendant was charged with violating this section by depositing in a federally insured bank several checks that were not supported by sufficient funds. The Court held that since, technically speaking, a check is not a factual assertion and cannot be characterized as "true" or "false," petitioner's deposits did not involve the making of a "false statement" as required by the statute.

The Honorable Allyne Ross
March 26, 2007
Page 16 of 24

   While the Court acknowledged that the drawer of a check is generally understood to represent that he currently has funds on deposit sufficient to cover the face value of the check, the Court held that the meaning of the term of "false statement" within the statute was not without ambiguity.  458 U.S. at 286.  The Court further noted that the legislative history failed to evidence Congressional awareness of the scope claimed for the statute by the government.  Id. at 290.  Finally, the Court noted that the reading of the statute championed by the government would make a "surprisingly broad range of unremarkable conduct" a violation of federal law.  Id. at 286.

   The Supreme Court concluded:

> To be sure, the rule of lenity does not give courts license to disregard otherwise applicable enactments.  But in a case such as this one, where both readings of § 1014 are plausible, "it would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the federal government in the business of policing the" deposit of bad checks.

Id. at 290 (citations omitted).

   The Second Circuit also has looked beyond the plain language of a statute where, as here, the scope of the statute was unclear.  In United States v. Rivera, 513 F.2d 519 (2d Cir. 1975), defendant was convicted before the United States District Court for the Southern District of New York for first degree murder of a federal narcotics agent, for wounding another agent during an attempted robbery of money and property of the United States and for assaulting a federal agent with a deadly weapon.  On appeal, the defendant argued that while 18 U.S.C. § 2114 on its face clearly encompassed the crime for which the defendant was convicted under Count 2 of the indictment (robbery of a person having lawful charge, control or custody of any mail matter or of any money or other property of the United States) the legislative history of the statute demonstrated that it was intended to be limited to postal related offenses.  Id. at 531.  The government argued that any resort to legislative history is inappropriate since the words of the statute are unambiguous.  However, the Second Circuit disagreed:

> Although there can here be no fair contention of lack of warning such as to make application of the statute offensive on due process grounds, the court should not extend criminal statutes to cases where Congress clearly did not intend them to apply but insufficiently expressed its intent.  The "rule of lenity" in applying criminal statutes … is an analogy.

Id. at 532 (citing Bell, 349 U.S. at 83-84).

The Honorable Allyne Ross
March 26, 2007
Page 17 of 24

In the present case, the plain language of the statute would suggest that a defendant may be guilty of the crime of forced labor pursuant to 18 U.S.C. § 1589 when the defendant obtains labor or services of the person by "physical restraint against that person" or "by means of any scheme plan or pattern intended to cause the person to believe that if the person did not perform such labor or services, that person ….would suffer serious harm or physical restraint."  By the same token, a plain reading of the language of 18 U.S.C. § 1591 would suggest that the defendant is guilty of violating the law when he uses "force, fraud or coercion" to cause the person to engage in a "commercial sex act."  However, when these statutes are applied in the context of the type of consensual 24/7 BDSM relationship present here, several terms in the statutes become ambiguous.

With regard to the forced labor statute, 18 U.S.C. § 1598, the term "labor or services" might include all forms of work covered by the broad dictionary definition of these terms or it may be limited to the type of work for which one would ordinarily expect to be compensated, thereby precluding reference to domestic chores performed during an intimate living arrangement.  Indeed, on the very day when the jury reached its verdict, it questioned the scope of the term "labor or services" in its final note.  (Tr.1428).  And, in response, the attorneys proposed differing definitions of the term "labor and services."  (Tr. 1428 – 1441).

Second, the terms "serious harm" and "physical restraint" may be given their ordinary meaning or may be limited only to those activities which were not within the scope of consensual BDSM behavior.

Third, in order to find the aggravating element, the statute requires that "the violation includes…aggravated sexual abuse or the attempt to commit aggravated sexual abuse…"  (emphasis supplied).  In the context of this case, it becomes unclear whether it is sufficient merely to show that during the course of their BDSM activities, the defendant engaged in conduct to which the complainant had not consented; or whether it was necessary to demonstrate that this conduct was undertaken with the express purpose of (a) obtaining the labor or services; or (b) creating the requisite "climate of fear" that would cause the complainant to provide the labor or services.

By the same token, with regard to the sex trafficking statute, 18 U.S.C. § 1591, the terms "force" and "coercion" can be given their everyday meaning, or they can be limited to conduct which is beyond the scope of consent in the BDSM relationship at issue.

And, the term "commercial sex act" may be deemed to include all sexual behavior provided that the defendant somehow profits from it; or, it may be limited to sexual conduct which falls outside the scope of the intimate relationship between the defendant and the complainant.

The Honorable Allyne Ross
March 26, 2007
Page 18 of 24

Because an examination of the plain meaning of the terms contained in the statutes will not resolve these issues, it is appropriate to examine the legislative history of the statutes at issue.

**3.      The Legislative History Demonstrates That The Defendant's Conduct Does Not Fall Within The Statutes**

Once this examination is undertaken, it becomes apparent that the statutes were, as indicated above, designed to prevent the organized exploitation of vulnerable individuals by uprooting them from their homes and transporting them for the purpose of sexual exploitation and other forms of forced labor, and when such behavior is undertaken predominantly for a business purpose.

In contrast, in the present case, the evidence establishes (1) that the complainant willingly agreed to participate in a BDSM relationship with the defendant; (2) that this BDSM relationship involved a full-time living arrangement and an agreement by the complainant to forfeit all control of the relationship to the defendant – a "total power exchange" or a contract of "consensual non-consent" as those terms were described by Dr. Charles Moser; and (3) that the complainant's work on the website was incidental to her relationship with the defendant.

Under these circumstances, it is clear that the statutes used to prosecute this defendant were not intended to proscribe the harm alleged by the complainant in this case. To permit the defendant's convictions on these two counts to stand would violate the "fair warning" component of the rule of lenity. Moreover, it would represent the application of a novel construction to these statutes.

In the present case, the interpretation favored by the government would also bring within the ambit of these statutes a broad range of conduct that is not typically prosecuted in federal courts. During the colloquy in response to the jury's request seeking further definition of the terms "labor or services," (Court Exhibit 20, Tr. 1428), the government argued "the idea of the forced labor statute was to broaden the concept of labor or services to include <u>anything</u> that somebody forces the other person to do." (Tr. 1430) (emphasis added). The defense then pressed the issue as follows:

> I go back to my example of the husband and wife who operate a bed and breakfast together. The finding is that the relationship evolves into an abusive one. Clearly, the government would be right in saying that working with your husband and serving people breakfast is labor, but was the statute intended to punish that kind of behavior? I don't think so, because under the circumstances here, one would ordinarily assume that compensation was going to be granted.

The Honorable Allyne Ross
March 26, 2007
Page 19 of 24

(Tr. 1432-33).

        The government responded:

> Mr. Sercarz is wrong.  The point is yes, it could be a forced
> labor.  If I said to my husband or wife, you will make
> breakfast every morning for me or else I'll kill you, that
> could be a form of forced labor.  I'm sorry, that is the
> definition.

(Tr. 1433).

        Finally, the government conceded that according to its definition even the
act of rape would be a basis for a finding that the defendant had obtained labor by force:

> I think technically, it is possible to bring a case based on a
> factual situation that looks like rape.  It is technically
> within the law.

(Tr. 1439-40).

        An examination of the legislative history set forth above clearly
establishes that Congress did not intend to use these statutes to prosecute either the crime
of rape or instances of domestic violence where the pretext for the abuse was the failure
to perform common household chores or even business activity conducted within the
home.  We do not dispute that the forced labor statute was an effort to punish the act of
compelling victims to perform work unrelated to the sex trade.  However, there is nothing
in the statute that suggests an intent to proscribe abusive conduct that arises in the context
of a domestic relationship.

        Finally, it is worthy of note that because the defendant and the
complainant carried on their relationship both in Maryland and in New York, the
government could have chosen to prosecute the defendant under the Mann Act which
proscribes a broader range of sexual behavior than the sex trafficking statute employed
here.  Moreover, since others were involved in the relationship between the defendant
and the complainant, the government also could have chosen to prosecute the defendant
for conspiring to violate the civil rights of the complainant in violation of 18 U.S.C. §
241.  In either case, the prosecution would have hinged only on proof that sexual conduct
which occurred during the relationship was non consensual.  Yet, the government elected
not to bring such charges.

The Honorable Allyne Ross
March 26, 2007
Page 20 of 24

    **4.**    **Conclusion**

        Accordingly, principles of due process, statutory construction and the rule of lenity require that the defendant's conviction on Counts One and Two of the Indictment be dismissed.

## POINT II.

### THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT THE COMPLAINANT ENGAGED IN A "COMMERCIAL SEX ACT"

        Count One charged Marcus with forcing or coercing the complainant to engage in a commercial sex act in violation of 18 U.S.C. 1591. A "sex act" was defined as an act that involves either (1) contact between the penis and the vulva and the anus; (2) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; and (3) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by an object with an intent to abuse, humiliate, degrade, or arouse or gratify the sexual desire of any person. (Tr. 1262-1263, Jury Instruction). A "commercial sex act" is a sex act as a result of which anything of value is given to or received by any person." 18 U.S.C. § 1591, Tr. 1261, Jury Instruction).

        The government asserted in its closing that the "commercial sex acts" at issue here are the instances where Marcus photographed the complainant in sexually explicit situations. (Tr. 1084). Specifically, the government argued:

> The government told you that the complainant performed … sex acts which involved, for example contact with the labia and other sexual organs … and that Marcus made money from it. *He photographs it and he got money from the website.*

(Tr. 1084-1085) (emphasis added).

        However, we respectfully submit that in order to qualify as a "commercial sex act" under the statute, the commercial gain must be achieved *as a result of* the act itself, not merely from a depiction of the act. There is nothing in the legislative history or case law relevant to this recently enacted statute that suggests any other interpretation. Indeed, the undersigned has failed to find a single case in which a defendant was prosecuted or convicted of a crime involving a commercial sex act for conduct involving the commercial enterprise of photographing or videotaping of sex acts. Each and every case uncovered in defense counsel's research involves prostitution.

        We again call the Court's attention to the Rule of Lenity as discussed above. As the Second Circuit has noted:

The Honorable Allyne Ross
March 26, 2007
Page 21 of 24

> The rule of lenity is that in criminal prosecutions ambiguities in a statute are resolved in the defendant's favor. It is reserved for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute. Such a persisting ambiguity should be resolved in favor of lenity.

Lurie v. Wittner, 228 F.3d 113, 125-26 (2d Cir. 2000) (quotations and citations omitted).

Accordingly, because the government failed to present any evidence that the complainant engaged in a "commercial sex act," it failed to meet its burden on Count One and the Court must enter a judgment of acquittal on that count.

## POINT III.

### THE GOVERNMENT FAILED TO ESTABLISH THAT THE PURPOSE OF MARCUS' ACTS OF VIOLENCE AND THREATS AGAINST THE COMPLAINANT WAS TO CAUSE HER TO ENGAGE IN A COMMERCIAL SEX ACT OR TO OBTAIN HER LABOR/SERVICES

Based on the above evidence, no rational trier of fact could have found that the government established beyond a reasonable doubt that Marcus committed the crimes of sex trafficking (Count One) or forced labor (Count Two). To obtain Marcus' conviction under the sex trafficking statute, the government had to prove beyond a reasonable doubt each of the following three elements: (1) Marcus knowingly engaged in a list of prohibited trafficking activities; (2) defendant's trafficking activities affected interstate commerce; and (3) Marcus knowingly employed force, fraud, or coercion to compel the complainant to engage in a commercial sex act. 18 U.S.C. § 1591.

Similarly, to sustain the jury's verdict under the forced labor statute, the Court must be satisfied that the government proved beyond a reasonable doubt that: (1) Marcus' knowingly obtained the complainant's labor or services; and (2) Marcus obtained the complainant's work by knowingly threatening serious harm or physical restraint or by otherwise causing the complainant to believe that if she did not work on his website then serious harm or physical restraint would result. 18 U.S.C. § 1589.

The evidence at Marcus' trial was insufficient to support the third element of Count One and the second element of Count Two because it failed to establish a sufficient nexus between Marcus' behavior, including his acts of force, his threats against the complainant, and other abusive conduct, and the complainant's work on and for the website. Although the trial evidence arguably established (1) that the complainant did not consent to Marcus' acts of punishment; and (2) perhaps even that Marcus' abusive conduct caused the complainant to remain in a sexual relationship against her will, it did

The Honorable Allyne Ross
March 26, 2007
Page 22 of 24

not establish to a sufficient degree that Marcus' conduct caused the complainant to work
on or pose for his website.

**A.      At Best, The Evidence Established that Marcus' Purpose
         Was to Maintain His Sexual Relationship with the Complainant**

         Marcus and the complainant were engaged in a 24/7 BDSM relationship in
which the concepts of pain, service, and punishment played a fundamental role.
According to the complainant, however, after October 1999 she no longer wanted to be in
this sort of BDSM relationship with Marcus.  Marcus, nevertheless, continued to inflict
pain upon her, forced her to abide by his rules, and imposed punishments when he so
desired.  Those punishments, as before, were at his whim and under a host of pretexts.
As the complainant explained, both before and after she withdrew her consent, "I was
punished just about every time I saw [Marcus] for something," (Tr. 97), and "I was
always being punished for being disobedient and it could be for no reason at all," (Tr.
207).

         In essence, although the complainant withdrew her consent and expressed
a desire to "break up" with Marcus, Marcus continued to engage the complainant in sex
and BDSM activity that amounts she to sex.  Marcus' actions after October 1999, therefore,
can be analogized to a husband or boyfriend who forcibly has sex with his wife or
girlfriend despite her protestations.  Just as the husband's act of sexual assault is not
designed to compel his wife to perform the domestic services that are incidental to most
marriages, such as the cooking, shopping, and cleaning, Marcus' acts of violence were
not designed to compel the complainant's services on his website.  Marcus' purpose
presumably was (1) to keep the complainant in a sexual BDSM relationship, and (2) to
satisfy his own desires.  The government failed to present sufficient evidence establishing
otherwise.

**B.      The Government Failed to Establish a Sufficient
         Nexus Between the Abuse and a "Commercial Sex Act"**

         The Court instructed the jury that, in connection with Count One, the
government had to prove beyond a reasonable doubt that the defendant's force, fraud or
coercion was intended "to cause" the complainant "to engage in a commercial sex act."
(Tr. 1256, Jury Instruction).  There was insufficient evidence to support the government's
argument that Marcus' abusive conduct "caused" the complainant to engage in the
commercial sex act of posing for the website.  Although the complainant suggested that
Marcus would punish her if she did not smile in a photo shoot, (Tr. 166) she did not
testify that a single punishment she endured after October 1999 was administered because
she did not participate or perform well in a photo shoot.  Indeed, her testimony regarding
the scope of her relationship with Marcus before October 1999, during the period of time
she admits was consensual, reveals that punishments for failing to smile or appear happy
were a routine part of the BDSM dynamic, and <u>never</u> had anything to do with compelling
her participation in photo shoots.  Instead, "[i]n all of the pictures, it was required that we

The Honorable Allyne Ross
March 26, 2007
Page 23 of 24

are to smile and the thing with Glenn Marcus is when you're with him you serve with gratitude, thankfulness, and joy and if you didn't, you were punished." (Tr. 85). Therefore, even accepting the complainant's testimony as true, a jury still could not reasonably infer that any abuse was intended "to cause the complainant to engage in a commercial sex act."

**C.    The Government Failed to Establish a Sufficient
       Nexus Between the Abuse and "Labor or Services"**

        In its instructions on Count Two, the Court instructed the jury that although the government did not need to link each of Marcus' threats and acts of violence to a particular labor task performed by the complainant, it was required to prove that Marcus' threats and violence were "connected" to the services she rendered. (Tr. 1268, Jury Instruction). Specifically, in order to meet its burden in connection with Count Two the government had to prove beyond a reasonable doubt that the purpose behind Marcus' actions was to punish the complainant for her work, or lack thereof, on the website or to create a "climate of fear" that compelled her services. (Id.). Once again, the government did not meet its burden.

        The complainant testified to only one instance of punishment that purportedly was related to her "labor or services" on the website. (Tr. 150). Although the complainant described the punishment, which included the insertion of a safety pin through her labia, notably, she never testified why exactly she was being punished. Other than answering affirmatively AUSA Chen's question "do you remember any particularly severe punishment Marcus imposed on you because of the job you were doing on the website," the complainant did not describe the purpose of the punishment. The complainant did not explain what, if anything, prompted the one act of violence on Marcus' part that purportedly was related to the complainant's labor and/or services.

        To the contrary, when the complainant's testimony is taken as a whole, it is clear that Marcus did not design any of the punishments, including the safety pin incident, to compel the complainant to work on the website. Although she testified she "was always being punished," (tr. 207), she did not testify that any other incident in which Marcus imposed punishment or threatened the complainant was connected in any way to her work. The complainant did not testify that Marcus abused her or threatened her because she didn't work hard enough or well enough on the website or because Marcus was trying to get her to work in the future. The only reasonable inference based on all of the evidence, therefore, is that the safety pin incident was like all of the other punishments the complainant consistently endured. The punishments were predominantly a means by which defendant maintained his status in the relationship. The punishments were sexual in nature. Indeed, the photographs that captured this particular incident reveal that the complainant engaged in sexual conduct with Rona during the punishment. Based on all of the evidence, the complainant's one answer to AUSA Chen's leading question was not enough from which the jury could have inferred that Marcus' purpose in abusing the complainant was to get her to work on his website.

The Honorable Allyne Ross
March 26, 2007
Page 24 of 24

## POINT IV.

## IN THE ALTERNATIVE, THE COURT
## SHOULD GRANT DEFENDANT A NEW TRIAL

The jury labored for seven full days prior to reaching a verdict in this case. Their final note, (Court Exhibit 20), indicates clearly that they were struggling to apply the elements of the crimes charged in the context of the "24/7" BDSM relationship between Marcus and the complainant.

Our review of the legislative history demonstrates, we submit, that neither of the statutes under which the defendant was convicted was meant to be applied in the context of an intimate, domestic relationship that has become abusive. But assuming *arguendo* that there are some personal relationships that can run afoul of the statutes, this can only occur when the <u>dominant</u> purpose of the force, fraud or coercion (Count One) or the threats of violence or pattern of coercion (Count Two) were to obtain the commercial sex act (Count One) or the labor or services (Count Two).

In this case, the task of the jury was complicated by the fact that the complainant entered into a consensual relationship with the defendant in which force, restraint, and punishment were a desired goal of their behavior. There is every likelihood that the jury, despite its best efforts, failed to distinguish between sexual activity, on the one hand, and the coercion which is a required element of both statutes, on the other.

At a new trial, the jury must be instructed that it can only convict where it finds beyond a reasonable doubt that the <u>dominant</u> purpose of Marcus' abusive conduct toward the complainant was to force her to engage in a commercial sex act or to obtain her labor or services.

## Conclusion

For all of the foregoing reasons, pursuant to Federal Rule of Criminal Procedure 29, the Court must enter a judgment of acquittal on the above-referenced charges. In the alternative and at a minimum, pursuant to Federal Rule of Criminal Procedure 33, the Court should order a new trial.

Respectfully submitted,
/S/

Maurice H. Sercarz
Julia L. Gatto

cc: Pamela Chen, Esq.
     Solette Magnelli, Esq.