

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

F.#2004R00772

*One Pierrepont Plaza*
*Brooklyn, New York 11201*

*Mailing Address:* *147 Pierrepont Street*
*Brooklyn, New York 11201*

April 13, 2007

<u>Via Facsimile and Hand Delivery</u>
The Honorable Allyne R. Ross
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

          Re:  United States v. Glenn Marcus
               Criminal Docket No. 05-0457 (ARR)

Dear Judge Ross:

          The government respectfully responds to defendant Glenn
Marcus's motions, pursuant to Rules 29 and 33 of the Federal
Rules of Criminal Procedure, for a judgment of acquittal and/or a
new trial.

                    PRELIMINARY STATEMENT

          In his motion, Marcus seeks the extraordinary remedy of
having the Court overturn the jury's verdict and find that the
forced labor and sex trafficking statutes do not apply to his
conduct, based on the defense's interpretation of the statutes'
legislative history and notwithstanding the lack of ambiguity in
the statutes themselves.  <u>See</u> Letter of Maurice Sercarz, Esq. and
Julia Gatto, Esq. to the Honorable Allyne A. Ross, dated March
26, 2007 ("Def. Mot."), at 1, 14-20.  Marcus also argues that the
evidence at trial was insufficient to establish that (1) the
victim had engaged in a commercial sex act; and (2) Marcus used
force or threats to compel the victim's labor and services.  <u>Id</u>.
at 1-2.  Marcus alternatively argues that a new trial is
warranted because the jury should have been instructed to find
that Marcus's "dominant" purpose in using force or threatening
the victim was to cause her to engage in a commercial sex act or
provide labor or services.  <u>Id</u>. at 2.  As discussed below,
Marcus's motions lack merit and should be denied in their
entirety.

As an initial matter, Marcus's argument about the inapplicability of the forced labor and sex trafficking statutes is premised on a factual assertion that the jury clearly rejected in reaching its verdict, i.e., that Marcus's conduct consisted solely of engaging in a "consensual," "intimate [and] domestic" relationship with the victim.  Def. Mot. at 1, 17.  Here, the jury had ample evidence to find that, after Marcus's BDSM relationship with Jodi ceased to be voluntary, he knowingly used violence, threats and other coercion, such as restricting her liberty through a climate of fear, to compel her to continue participating in BDSM activities (from which Marcus profited) and other labor and services, such as managing Marcus's website.  The jury's finding that Marcus's use of violence and threats was not limited to a consensual BDSM relationship, but was intended, either in whole or part, to compel Jodi's labor or services, makes Marcus's conduct punishable under these statutes.  Because Marcus's conduct fits squarely within the proscriptions of the forced labor and sex trafficking statutes, there is no justification for looking beyond their plain language, as Marcus urges the Court to do, to reach the extraordinary conclusion that Congress nonetheless did not intend for his conduct to be regulated by these statutes.

In any event, Marcus's arguments regarding the purposes of the forced labor and sex trafficking statutes, which were enacted as part of the Trafficking Victims Protection Act of 2000 ("TVPA" or the "Act"), are completely without merit.  Marcus invokes the rule of lenity to argue that the Court should find that the TVPA was meant only to regulate the "international sex and forced labor trade," and that it should not be applied to purely domestic activities or acts that occur within the context of, or in relation to, a personal relationship.  Def. Mot. at 1. However, Marcus's reading of the TVPA's legislative history is erroneous and incomplete, and his reliance on the rule of lenity is misplaced given the clarity of the Act's provisions.  Both the TVPA's legislative history and the language of its statutes make clear that it was intended to deter and punish both domestic and international trafficking, and that prosecution under the Act is not precluded simply because the defendant and victim are involved in a personal relationship.[1]  Accordingly, there is simply no basis, either in the TVPA's legislative history or its

---

[1]  Again, whether Marcus's acts of violence and threats against Jodi were done to compel her labor or solely as part of a consensual BDSM relationship was a <u>factual</u> question for the jury to decide.

provisions, for the Court to find that the TVPA does not apply to the conduct for which Marcus was convicted.

Furthermore, the Court should deny Marcus's request for a new trial. Marcus has requested a new trial so that the jury can be instructed that it must find that Marcus's "dominant" purpose in using violence and threats against Jodi was to compel her labor or services. Def. Mot. at 2. Marcus, however, points to no authority for this proposition, nor can he. Id. at 24. Under the TVPA, there is no requirement that the defendant's sole or dominant purpose in engaging in the improper conduct was to obtain the victim's labor. Indeed, as discussed below, reading such a requirement into the TVPA would defeat its goals.

In sum, Marcus has failed to provide any legally sufficient basis for the Court to overturn the carefully considered verdict of the jury, which deliberated for seven full days in this case. There can be no doubt that the jury was thorough and careful in its deliberations, and that, as reflected in its notes to the Court, it focused on the critical issues underlying the crimes with which Marcus was charged. The fact that the jury acquitted Marcus of one of the three charges, and that there was no inconsistency between these verdicts, is further evidence of the care and thoughtfulness of the jury's deliberations. To overturn the jury's verdict based on unsupported, speculative and erroneous arguments about Congress's intent in passing the TVPA and about the jury's application of the law to the evidence would effectively usurp the role of both Congress and the jury. Accordingly, Marcus's Rule 29 and 33 motions should be denied in their entirety.

<u>STATEMENT OF FACTS</u>

A.   <u>The Beginning of Marcus's Relationship with Jodi</u>

In 1998, the victim in this case, Jodi, a 31-year-old woman, was living with her parents in the Midwest. (Trial Transcript ("T") 69-70, 248). Jodi, who had recently finished college, had led a relatively sheltered life up until that time. (T 70, 252). While surfing the Internet, Jodi became interested in alternative sexual lifestyles, including bondage, dominance/submission and sado-masochism ("BDSM"). (T 70). Jodi became involved in two dominance/submission ("DS") relationships. (T 71-72, 220-21, 227-28).

Jodi's first DS experience was very brief and involved almost no physical contact. (T 71-72). Jodi's second DS experience, with a man named Irving, while more physically

intense, involved agreed-upon limits based on a checklist that
Irving had Jodi complete regarding her preferences and aversions.
(T 72, 220 238.)  Jodi was also able to use a safeword with
Irving to stop any activity with which she was uncomfortable.  (T
70-72).

        In the fall of 1998, Jodi met Marcus in a BDSM
chatroom.  (T 71-73, 248).  She was immediately attracted to his
charisma.  (T 76).  Marcus, who went by the screen name
"gmyourgod," invited Jodi into his private chatroom, "foundgod."
(T 73-74).  There, Marcus told Jodi about his version of the
Master-Slave relationship, in which the slave is completely
submissive to him.  (T 74-75).  Although Marcus gave extreme
examples of what he might ask of his slaves, two of Marcus's
then-current slaves, "doggie" (Joanna) and "nameless" (Celia),
who were in the private chatroom with Jodi and Marcus, assured
Jodi that Marcus would never injure her or make her hurt anyone
else.  (T 74-75).

        Marcus and Jodi thereafter spoke privately by
telephone.  (T 75-76).  They talked about their lives and past
experiences.  (T 75).  In particular, Jodi told Marcus about her
abusive childhood and how, growing up, she was subjected to
emotionally and physically abusive conduct by her mother,
including being hit with a stick while naked in the middle of the
family's livingroom and being forced to shower with her mother,
who then criticized Jodi's body.  (T 210; Government Exhibit
("GX") 2a at 691-92.)[2]  Jodi also told Marcus she had suffered
from an eating disorder when she was a young woman.  (T 210; GX2a
at 691-92).  Marcus told Jodi that her family was bad for her and
that he knew she was meant to serve him.  (T 76, 210-11).

        Between October and December 1998, Jodi traveled to
Joanna's home in Maryland on at least two occasions to meet with
Marcus.  (T 76-77, 260).  During these trips, Jodi engaged in
BDSM activities with Marcus, Joanna and Celia that were more
intense than Jodi had previously experienced and included being
whipped and having the word "slave" carved into her stomach.  (T
76-77, 252-54, 261).  On one occasion, Marcus attempted to choke
Jodi, but eventually stopped when she became hysterical.  (T 78,
254-55, 262).

---

        [2]  GX2a is a DVD that contains the Slavespace website.  As
requested by the Court, the government will provide copies of the
trial exhibits referenced herein.

At the end of 1998, Jodi decided that she wanted to serve Marcus. Jodi had to submit a "petition" before being allowed to do so. (T 78-81, 270-72, GX2a at 1051). Jodi wrote a petition, which Joanna edited, and sent it to Marcus. (T 81, 270-72). The petition was posted on the BDSM website operated by Marcus and Joanna, "subspace.com." (GX2a at 1051).

In January 1999, Jodi moved to Maryland to live with Joanna and begin serving Marcus.[3] (T 78, 83). Upon her arrival in Maryland, Marcus shaved Jodi's head in order to signify that she was now his property. (T 79, 83-85). Having a shaved head also kept Jodi from leaving the house and socializing because she felt uncomfortable with her appearance. (T 97). Soon thereafter, Marcus branded Jodi on the buttocks with a "G" to further signify his ownership of her. (T 83-85). Jodi did not object to these acts. (T 85). However, with respect to the branding, there were unexpected consequences. (T 86). Although Marcus assured Jodi that the brand would not be permanent, within a few hours of the branding, the wound broke open and caused a scar that Jodi has to this day. (T 86). Furthermore, at the time the wound opened up, Marcus would not allow Jodi to be taken to the hospital. (T 86).

For the next several months, Jodi lived with Joanna and served Marcus voluntarily. (T 107, 277, 381). Although Marcus lived in New York, Jodi and Joanna followed Marcus's instructions even when he was not there, including daily recitations of a list of commands called "Master's Expectations," cold showers, and wearing breast clamps or butt plugs. (T 93-99; GX2a at 1014). Joanna and Jodi were required to watch over each other to ensure the other's compliance, and to report any non-compliance to Marcus, who would punish the offender. (T 95-96). Sometimes, Marcus would require Jodi or Joanna to carry out the punishment. (T 96).

---

[3] In his motion, Marcus states that "the complainant and Marcus began a "24/7 BDSM relationship," a term defined by the defense's expert, Charles Moser. (T 865, 880-82). Def. Mot. at 3. However, Dr. Moser never testified or opined that Marcus's and Jodi's relationship constituted a 24/7 BDSM relationship, as he defined that term. (T 864-65, 878, 920). In fact, Marcus's version of the Master-Slave relationship did not fit within Dr. Moser's definition of a 24/7 BDSM relationship, which has implicit limits and assumes that the Master will not injure or harm the slave, and will act to protect the Slave's emotional and physical well-being. (T 893-94).

When Marcus came to Maryland, which was about every two weeks, he engaged in BDSM activities with Jodi, Joanna and sometimes other women.  (T 86-87, 90-92, 278).  Virtually all of these activities were photographed by Marcus and posted on the Subspace website.  (T 91-93).  In addition, Marcus required all of his slaves to write diaries describing their BDSM activities with Marcus, whom they referred to as "Sir" in the diaries, and praising and expressing gratitude to him.  (T 91-92).  Marcus reviewed and edited the diaries to ensure that they portrayed him as the ultimate Master and his slaves as joyful and enthusiastic servants.  (T 91, 336).

B.   **Marcus's Relationship with Jodi Turns Non-Consensual**

As time went on, Jodi grew gradually more depressed about her situation.  (T 98).  Marcus's conduct toward Jodi had changed from the time of Jodi's initial visits to Maryland.  (T 87-88, 98).  Marcus's "punishments" became increasingly more brutal, frequent and random.  (T 98).  Jodi felt that she could never please Marcus.  (T 98, 123-24).

1.   **June 1999: Cigarette Burning Incident**

By June 1999, Jodi had become so depressed that she burned herself with a cigarette.  (T 98, 282, 393).  Fearing that Marcus would discover the burn marks, Jodi called Marcus in New York and told him what she had done.  (T 98).  Marcus responded by directing Joanna first to burn herself with a cigarette and then to punish Jodi by defecating on her in the bathtub and making Jodi clean the bathtub with her tongue.  (T 98-99).  Marcus also told Jodi that he would punish her further when he came to Maryland.  (T 99).  During his next trip, Marcus punished Jodi for burning herself.  (T 99).  First he slapped Jodi so hard that she "saw stars."  (T 99).  Then he torturously burned her all of her body with cigarettes.  (T 99-100, 282).  Marcus even burned Jodi on the inside of her vagina.  (T 99). After this incident, Jodi felt depressed and that she deserved to be punished.  (T 103, 281-82).

Soon thereafter, Marcus asked Jodi to recruit a new slave for him and to bring Jodi's younger sister to Marcus so that he could drug her with "ruffies"[4] and make her his slave. (T 103, 283-85, 393-94).  Jodi attempted to recruit another slave

---

[4]  Ruffies, often referred to as the "date rape" drug, are a powerful sedative that cause a person to become very compliant. (T 441-42).

for Marcus online.  (T 104; GX29.)  This effort, however, failed.
(T 103-04, 289).  In addition, Jodi decided that she could not
bring her sister to Marcus.  (T 103-04).  When Jodi told Marcus
this, he told her that she would be punished more harshly than
ever before for having failed both to find Marcus a new slave and
deliver her sister to Marcus.  (104, 206-07, 289; GX31 at 2).

2.  <u>October 1999: Whiffle Ball Incident</u>

It was during Marcus's next visit to Maryland, sometime
in October 1999, that Jodi was punished for these failures.  (T
104, 290, 381).  In preparation for the punishment, Jodi was
shackled to the wall in Joanna's bedroom.  (T 104, 285).  Marcus
decided to take a nap in Joanna's bed, while Joanna and Celia
both remained in the bedroom.  (T 104-05, 290).  As Marcus slept,
Jodi had a "flash of clarity" and saw herself back home; she
decided that she wanted to leave Marcus.  (T 104-05, 304, 393).
Jodi asked Celia to help her off the wall, which Celia did.  (T
105, 288, 290).  Jodi and Celia went into the other bedroom.  (T
105, 290).

Joanna, seeing that Jodi had gotten off the wall, woke
Marcus up.  (T 105, 287-88, 290, 294).  Marcus told Joanna to put
Jodi back on the wall, which she did.  (T 105-06, 291-92).  Up
until that point, Jodi believed that Marcus would let her leave
if she told him she wanted to go.  (T 105, 312, 394-95, 414).
Once back on the wall, Jodi told Marcus that she wanted to leave.
(T 106, 296).  Marcus responded by telling her to shut up.  (T
106.)  He hooded her and placed a whiffle ball in her mouth.  (T
106-07, 285).  He then inserted five 1-1/2" surgical needles
through her lips to keep the whiffle ball in place.  (T 105-06).
Jodi was crying and sreaming.  (T 106).  Marcus whipped Jodi
severely.  (T 160).  He took her off the wall, tied her to a
board and attempted to sew her vagina shut with a needle and
thread, but the needle broke, which angered Marcus.  (T 106-07).
Marcus instead carved his initials "GM" into the soles of her
feet.  <u>Id</u>.  He also wrote words like "cunt" and "bitch" all over
her body.  (T 122-23).  At the end, Marcus made Jodi watch
television with him and the other two women, with the whiffle
ball and needles still in her mouth.  (T 107, 293).  Although
Marcus had sex with Jodi while she was on the wall, Jodi derived
no sexual pleasure from this ordeal and did not want to have sex
with Marcus.  (T 107-08, 121).

After this incident, Jodi was terrified of Marcus.  (T
305-06, 108).  He had never engaged in such extreme brutality
towards her before.  Although Jodi had voluntarily engaged in
intense BDSM activities with Marcus in the past and had willingly

submitted to previous punishments, the whiffle ball incident was the most severe conduct that she had experienced with Marcus or seen him engage in with anyone else.  (T 123-24).  Prior to that time, Jodi believed that she could end the relationship simply by asking to leave.  (T 394-96).  But after the incident, she feared that Marcus would hurt her if she asked or tried to leave.  (T 124).  She even believed that if she left him, he might find and hurt her.  (T 123-24).  After this incident, Jodi did not leave, and continued to obey Marcus out of fear.  (T 124, 305-06, 392).

   3.   <u>November 1999: Marcus's Threats to Joanna</u>

      A short time later, in November 1999, Joanna told Marcus that she wanted to end their relationship.  (T 305).  Marcus responded by threatening to kill Joanna's godson and to send sexually explicit photographs of Joanna to her elderly father.  (T 127-28; GX28; T-28 at 19).  Marcus also used the situation to communicate to Jodi what would happen to her if she left him.  (T 127-28).  Marcus's threat to Joanna was made during a telephone conversation between Marcus, Joanna and Jodi.  (T 127-28).  Thereafter, Marcus repeatedly told Jodi about the sexually explicit materials he planned to send to Joanna's father, including a videotape of Joanna engaging in sexual activity with three other women.  (T 128-30, 412; GX12).  While Marcus never followed through on his threats, Jodi nonetheless believed that Marcus was serious and that he was capable of executing them.  (T 124, 128, 312, 408-09).  Joanna eventually evicted Jodi from her apartment and obtained a restraining order against Marcus.  (T 132-33, 309).

C.   <u>Marcus Forces Jodi to Perform Sex Acts and Work on His Website</u>

   1.   <u>Jodi's Work on Marcus's Website</u>

      As Marcus's relationship with Joanna was ending, Marcus took steps to ensure that could start another BDSM website.  Marcus "blackmailed" Joanna into turning over the materials from the Subspace website, and he directed her to teach Jodi how to operate the website, telling both women that he wanted "every available hour devoted to that." (GX34 at 5-6, 14).  Marcus also told Jodi that he did not want to hear anything from her "except how my site is doing."  (GX30).  Marcus made Jodi create a new website, "Slavespace.com," and download the multitude of images and text from the Subspace website to Slavespace.  (T 139, 143).

      In January 2000, Marcus arranged for Jodi to move in with Rona in Queens.  (T 134).  Marcus Marcus described Rona as

his slave since they were teenagers. (T 134, 327, 672-73). Rona was, in fact, Marcus's former girlfriend and had known Marcus since they were young. (T 657-58, 327-28).

After Jodi moved in with Rona, Marcus made Jodi manage the website. (T 148-49). Jodi spent 8-10 hours each day posting new pictures and diaries, and clicking on banner advertisements in order to make money for Marcus and to increase Slavespace's visibility on the Internet. (T 330, 332-33, 401). Marcus closely monitored Jodi's work by logging onto the Slavespace website every day, and he collected the revenue from the website from her. (T 153, 317-18, 400.) When Marcus felt that Jodi was not performing her job adequately, Marcus punished her. (T 149-50). One of the more severe work-related punishments Marcus inflicted on Jodi occurred in approximately April 2001. (T 150-51, 335). On that occasion, Marcus tied Jodi to a coffee table in Rona's apartment and whipped her with a knife, causing slash marks on her abdomen. Id. Marcus then pierced her labia with a safety pin. Id. Marcus was sexually aroused by this incident, and had sex Jodi afterward. (T 150-51, 155).

Jodi received no compensation for her work on Marcus's website; all of the income from the website went to Marcus. (T 153). Jodi performed the work on Marcus's website out of fear and because she felt she had no choice. (T 149).

2.  <u>Jodi's Compelled Participation in BDSM Activites</u>

Similarly, with respect to the BDSM activities she engaged in with Marcus while living in New York, Jodi felt compelled to participate out of fear. (T 124, 149, 158, 159-60, 168, 172, 175, 320, 341-42, 375, 398, 409). Any disobedience or failure to appear happy prompted punishment by Marcus. (T 158-59, 208-09, 319-20, 396, 400, 414). This punishment, however, was no longer part of the consensual, mutually satisfying BDSM relationship that Jodi had originally entered into, but was used by Marcus to force Jodi to comply with Marcus's increasingly more selfish demands to engage in sexual activities that Marcus could photograph for his website. (T 150-58, 320-22, 259-60, 262-63). Jodi was no longer consenting to, nor deriving any pleasure from, the extreme BDSM activity that Marcus forced her to engage in, such as chokings and piercings of her breasts with needles. (T 157-58, 170-72, 162-64, 197, 280, 320). However, Marcus did not care whether Jodi consented to these activities and instead ensured her compliance through threats and punishments. (T 128, 158-68, 347).

At the same time, Jodi believed that there would be serious consequences if she simply left Marcus.  Aside from her fear that Marcus would find and harm her, she believed that Marcus would also expose Jodi's BDSM activities to her family, as he had threatened to do to Joanna.  Marcus, in fact, told Jodi in 2001 that he would send pictures to her family and the media if she left him.  (T 159, 174, 311).  Trapped by her fear and isolated by her circumstances, Jodi remained with Marcus into 2001.  (T 83-84, 159, 173-74, 318, 329, 352).

3.  <u>March 2001: Basement Incident</u>

By the spring of 2001, Jodi had been working for some time at an outside job in a corporate office.  (T 153, 159, 331, 333).  Emboldened by her contact with others, Jodi again envisioned the possibility of leaving Marcus.  (T 159).  In March 2001, Jodi told Marcus that she wanted to leave.  (T 159-60, 218, 385).  He responded that he would only let her go if she endured a final punishment.  (T 160, 337).  Although terrified, Jodi agreed because she felt that it was her only way to be free of Marcus.  (T 160).  On a Saturday, Marcus picked Jodi up from Rona's apartment and took her to the home of Marcus's then-girlfriend, Sherri, in Long Island.  (T 161).  From the moment Jodi got into Marcus's car, he would not let her speak, although she was hysterical and crying.  <u>Id</u>.  When they got to Sherri's house, Marcus made Jodi strip and told her to go down to the basement.  <u>Id</u>.  As Jodi started down the stairs, she panicked and tried going back up, but Marcus blocked her way and pushed her down the stairs.  <u>Id</u>.  Jodi became hysterical and began screaming.  <u>Id</u>.  Fearing that the neighbors would hear her, Marcus slammed Jodi's head into a metal pole.  (T 162).  Marcus suspended Jodi with a rope tied around her hands and feet to a metal pole that ran along the ceiling.  (T 162).  When Jodi continued to scream, Marcus wrapped a wire or string around her tongue and inserted a surgical needle into it.  (T 162).  He also forced her to swallow a valium.  (T 164, 321; T-28 at 17).  Marcus then beat and whipped Jodi until she was covered with bruises.  (T 164-65).  After beating her, Marcus left Jodi hanging by her hands and feet and went upstairs.  (T 165).  After a long time, he returned and, after letting Jodi down, made her crawl up to the second floor bathroom, where he made her pose, smiling, for photographs for the website.  (T 165-66, 321-22).  Marcus then forced Jodi to have sex.  (T 166).  During the incident, Marcus repeatedly told Jodi that she needed to continue serving him and that she belonged to him.  (T 165).  After the incident, Jodi became too depressed and afraid to even think about leaving.  (T 108, 337, 398).

D.   <u>Fall 2001: Marcus Releases Jodi</u>

   1.   <u>Jodi Moves out of Rona's Apartment</u>

        Starting around the fall of 2001, Marcus began to
exercise less control over Jodi.  (T 172-73, 318).  In September
2001, Rona asked Marcus if Jodi could house-sit for Rona's
brother.  (T 172, 699).  While there, Jodi saw Marcus less
frequently and he no longer required her to work on his website.
(T 173).  When Rona's brother returned, Jodi got her own
apartment.  (T 338-339).  Although she still saw Marcus and
engaged in sexual activities with him, he was no longer violent
towards her.  (T 173-77).  Jodi, who was extremely confused and
disoriented by her unexpected freedom, was involved with Marcus
voluntarily for a period of time after she moved out of Rona's
apartment.  (T 340-42, 365, 382).  Because she still feared that
Marcus might release her photographs, Jodi remained in contact
with Marcus into 2003.  (T 176, 351-52).

   2.   <u>January - February 2005: Marcus's Statements to Jodi</u>

        In January and February 2005, Jodi engaged in several
recorded telephone calls with Marcus at the direction of the
Federal Bureau of Investigation ("FBI").  During a conversation
on February 5, 2005, Marcus told Jodi that he had decided that he
no longer wanted Jodi to serve him and had, in effect, released
her.  (T-28 at 5.)  With regard to the basement incident, Marcus
explained that the purpose of that "punishment" session was to
"reinforce the need to serve."  <u>Id</u>.  Marcus justified his torture
of Jodi by explaining that they had an agreement that he could do
with her whatever he wanted notwithstanding the fact that she
wanted to leave.  <u>Id</u>. at 4-5.  According to Marcus, he was within
his right to decide whether he should honor a woman's request to
stop serving him or to  punish that request as a "moment of
weakness."  <u>Id</u>. at 5.

E.   <u>24/7 BDSM Relationships</u>

        At trial, the defense offered the testimony of an
expert on BDSM, Dr. Charles Moser.  Dr. Moser testified, in part
and substance, to the following:

        The term BDSM is defined as bondage and discipline,
dominance and submission, sadism and masochism.  All those terms
have their own definitions attached to them and there is no
unanimity of opinion among professionals about what that
constitutes.  Generally what is meant is sexual arousal from the
exchange of power where a power differential is seen as erotic to

the participants.  (T 865-66).  Often, in a BDSM interaction, a person wants to struggle as part of his/her role.  For this reason, it is sometimes necessary create a word or a gesture that means that the person really wants the action to stop.  (T 876).

Total Power Exchange, or TPE, is when a person voluntarily decides that they want all of the power to be transferred to the dominant partner.  (T 881).  People who engage in abuse could use a 24/7 BDSM relationship to legitimize or find support for their abusive inclinations or intentions. (T 895).  The difference between domestic violence and sadomasochism is consent.  (T 896).

Dr. Moser, in conjunction with his colleagues, devised guidelines for health care professionals to use when interviewing BDSM participants:

Was informed consent expressly denied or withdrawn?

Were there factors that negated the informed consent?

What was the intent of the accused abuser?

Are your needs and limits respected?

Is your relationship built on honesty, trust and respect?

Are you able to express feelings of guilt or jealously or unhappiness?

Can you refuse to do illegal activities?

Can you leave the situation without fearing that you will be harmed or fearing that other participants will harm themselves?

(T 906-07).  A "no" to any of these questions indicates potential abuse.  (T 908).  Abuse and rape can occur within a BDSM relationship (T 909-10, 918).

<u>ARGUMENT</u>

A.   <u>Legal Standards Governing Rule 29 and 33 Motions</u>

    1.   <u>Rule 29</u>

        Rule 29, in relevant part, provides:

        (a)  After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction . . . .

        (b) The Court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.  If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

    "A defendant challenging a conviction based on sufficiency grounds bears a heavy burden."  <u>United States v. Desena</u>, 260 F.3d 150, 154 (2d Cir. 2001) (citing <u>United States v. Matthews</u>, 20 F.3d 538, 548 (2d Cir. 1994)); <u>see United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000) (defendant "shoulders 'heavy burden' in challenging sufficiency of evidence supporting conviction") (quoting <u>Matthews</u>); <u>United States v. Strauss</u>, 999 F.2d 692, 696 (2d Cir. 1993) (defendant's burden is "very heavy").  In reviewing a conviction for an alleged insufficiency of evidence, a court must "'view the evidence in the light most favorable to the government, construe all permissible inferences in its favor, resolve all issues of credibility in favor of the jury's verdict, and uphold a conviction if any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt.'"  <u>Desena</u>, 260 F.3d at 154 (quoting <u>United States v. Reyes</u>, 157 F.3d 949, 955 (2d Cir. 1998)).

    The Court "'must determine whether, based upon all of the evidence presented at trial and 'giving full play to the right of the jury to determine credibility, weigh the evidence, and draw reasonable inferences of fact, a reasonable mind might

14

fairly conclude guilt beyond a reasonable doubt.'" <u>Mariani</u>, 725
F.2d at 865 (quoting <u>United States v. Taylor</u>, 464 F.2d 240, 243
(2d Cir. 1972)); <u>United States v. Itzkowitz</u>, No. 96-CR-786(JG),
1998 WL 812573, at *1 (E.D.N.Y. May 13, 1998) (quoting <u>Mariani</u>).
If the Court concludes that "either of the two results, a
reasonable doubt or no reasonable doubt, is fairly possible, [it]
must let the jury decide the matter." <u>Taylor</u>, 464 F.2d at 243
(quoting <u>Curley v. United States</u>, 160 F.2d 229, 232-33 (D.C. Cir.
1947)); <u>Autuori</u>, 212 F.3d at 114 (quoting <u>United States v.
Guadagna</u>, 183 F.3d 122, 129 (2d Cir. 1999)).

        Rule 29 does not provide the trial court with an
opportunity to "substitute its own determination of the
credibility of the witnesses, the weight of the evidence and the
reasonable inferences to be drawn for that of the jury."
<u>Mariani</u>, 725 F.2d at 865; <u>see</u> <u>Autuori</u>, 212 F.3d at 118 (trial
judge is not entitled to set aside a guilty verdict simply
because he would have reached a different result than the fact-
finder); <u>Guadagna</u>, 183 F.3d at 129 (following <u>Mariani</u>); <u>Strauss</u>,
999 F.2d at 696 (jury is exclusively responsible for determining
witness's credibility); <u>United States v. Weinstein</u>, 452 F.2d 704,
713 (2d Cir. 1971) (trial court should not direct acquittal based
on its disbelief of government's witnesses).  These restrictions
"are necessary to avoid judicial usurpation of the jury
function." <u>Mariani</u>, 725 F.2d at 865; <u>Autuori</u>, 212 at 114.  Thus,
a judgment of acquittal should only be entered "if the evidence
that the defendant committed the crime alleged is 'nonexistent or
so meager that no reasonable jury could find guilt beyond a
reasonable doubt.'" <u>Guadagna</u>, 183 F.3d at 130 (quoting <u>United
States v. White</u>, 673 F.2d 299, 301 (10th Cir. 1982)).

    2.  <u>Rule 33</u>

        "Federal Rule of Criminal Procedure 33 authorizes a
district court to grant a new trial 'if required in the interest
of justice.'  Such authority is only exercised, however, in the
most extraordinary circumstances." <u>United States v. Locascio</u>, 6
F.3d 924, 949 (2d Cir. 1993); <u>see</u> <u>United States v. Ferguson</u>, 246
F.3d 129, 134 (2d Cir. 2001) ("trial court has broader discretion
to grant a new trial under Rule 33 than to grant a motion for
acquittal under Rule 29, but it nonetheless must exercise the
Rule 33 authority 'sparingly' and in 'the most extraordinary
circumstances'") (quoting <u>United States v. Sanchez</u>, 969 F.2d
1409, 1414 (2d Cir. 1992)).

As the Second Circuit explained in <u>Ferguson</u>:

> The ultimate test on a Rule 33 motion is
> whether letting a guilty verdict stand would
> be a manifest injustice.  The trial court
> must be satisfied that "competent,
> satisfactory and sufficient evidence" in the
> record supports the jury verdict.  The
> district court must examine the entire case,
> take into account all facts and
> circumstances, and make an objective
> evaluation.  "There must be a real concern
> that an innocent person may have been
> convicted."

246 F.3d at 134 (citations omitted).  Consideration of a new
trial motion is committed to the broad discretion of the district
court, and a denial of a Rule 33 motion is reviewed only for
abuse of discretion.  <u>See</u> <u>United States v. Wong</u>, 78 F.3d 73, 78
(2d Cir.1996); <u>United States v. Parker</u>, 903 F.2d 91, 103 (2d Cir.
1993).

B.   <u>The Evidence Was Sufficient for the Jury to Find Marcus
     Guilty of Sex Trafficking and Forced Labor</u>

     Marcus makes two principal challenges to the
sufficiency of the evidence: (1) that the evidence failed to
establish that Jodi engaged in "commercial sex acts" as defined
by the TVPA (Def. Mot. at 20-21); and (2) that the evidence was
insufficient to establish a nexus between Marcus's acts of
violence and threats against Jodi and the labor and services he
obtained from her (<u>Id</u>. at 21-23).  Neither claim has merit.

     1.   <u>The Evidence at Trial Was Sufficient to Establish that
          Jodi Engaged in Commercial Sex Acts</u>

     Marcus argues that the evidence at trial failed to
establish that Jodi engaged in commercial sex acts, as defined by
the TVPA, because the money Marcus made from Jodi's sex acts was
not from customers paying for the acts themselves, as in
prostitution, but from the photographic depictions of those acts.
Def. Mot. at 20.  However, this argument, in reality, is not
about the sufficiency of the evidence but about statutory
interpretation.

     Section 1591 broadly defines a "commercial sex act" as
"any sex act, <u>on account of which</u> anything of value is given to
or received by <u>any person</u>."  18 U.S.C. § 1591(c)(1) (emphasis

16

added).  The language Congress used in this definition is as broad as possible.  Rather than requiring that the money (or thing of value) be given to "pay for" the sex act, Congress used the phrase "on account of" to signify that the financial or other gain is not limited to money paid directly for sex.  Yet, Marcus, citing no authority, argues that "the commercial gain must be achieved *as a result of* the act itself, not merely from a depiction of the act."  Def. Mot. at 20.  However, had Congress intended to limit the definition simply to acts of prostitution, it could easily have done so.

This interpretation of "commerical sex act" is consistent with the TVPA's purpose, which is to deter and punish compelled labor, especially relating to sexual services.  See 146 Cong. Rec. H8855-02, 2000 WL 1476449 (Conference Report for TVPA bill, H.R. 2244, identifying the sexual exploitation of women and girls as a chief reason for the statute).[5]  Construing the definition of "commercial sex act" to encompass every sex act, regardless of how the money is made from that act, is consistent with that purpose.  The essence of the crime is the exploitation of the victim and not the manner in which the perpetrator profits from that exploitation.  In defining "commercial sex act" expansively, Congress clearly intended to include any sex act where someone makes money by forcing another person to engage in the sex act, whether the profit is made directly or indirectly from that act.  Accordingly, Marcus's argument regarding the "sufficiency" of the evidence establishing Jodi's participation in commercial sex acts must fail.[6]

2.   The Evidence Was Sufficient to Establish that Marcus's Violence, Threats and Coercion Compelled Jodi's Labor and Services

Marcus argues that the evidence at trial was insufficient to establish that Marcus's acts of violence and

_____

[5]   This Conference Report makes clear that Congress sought to attack all forms of sexual exploitation, including "prostitution, pornography, sex tourism, and other commercial sexual services."  146 Cong. REc. H8855-03, 2000 WL 1476449, at 2 (Conference Report on TVPA bill, H.R. 3244).

[6]   The evidence at trial established that Marcus made money from the BDSM acts that Jodi was forced to engage in by photographing Jodi performing these acts and posting the photographs on his BDSM website, from which he earned revenue. (T 153, 317-18).

threats caused Jodi to perform labor and services for him.  In order to prevail on this issue, Marcus must demonstrate that the evidence for this element was "'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" Guadagna, 183 F.3d at 130 (quoting White, 673 F.2d at 301). Marcus cannot meet this burden.

The evidence at trial established that Jodi began a consensual Master-Slave relationship with Marcus in approximately January 1999.  Within a relatively short period of time, however, she became depressed about the relationship and her situation, and acted out by burning herself with a cigarette.  Marcus responded to Jodi's depression by burning her entire body with cigarettes.  A few months later, in October 1999, as Jodi was awaiting punishment by Marcus for having failed to bring her sister to him and to recruit a new slave, Jodi told Marcus that she wanted to leave him.  Marcus responded by torturing Jodi more severely than he had ever done before.

Based on this evidence, the jury reasonably could have concluded that from beginning in October 1999, Marcus knew that Jodi did not want to be with him, and that he used fear to keep her from leaving and to make her perform labor and services that he needed, i.e., posing for and managing Marcus's website. Indeed, when Joanna left Marcus in November 1999, Jodi became his only "slave" and became essential to the operation of Marcus's website.  Marcus's determination to have Jodi maintain his website is reflected in the November 1999 IM communications between Marcus and others.  (GX34 at 5-6).  In that message, Marcus admits to that he is blackmailing Joanna to make sure she turns over the Subspace website materials and teaches Jodi how to operate Marcus's website.  Id. at 5-6, 14.  Marcus tells both women that he wants "every available hour devoted" to the project.  Id. at 14.  In another message, Marcus tells Jodi that he does not want to hear anything from "it" "except how my site is doing."  (GX30).

The jury had other evidence regarding Marcus's intent to keep Jodi working on his website.  In November 1999, after Joanna announced that she was leaving, Marcus pointedly made threats to Joanna with Jodi on the telephone.  In addition to threatening to kill Joanna's godson, Marcus said he would send sexually explicit pictures of Joanna to her father.  The fact that Marcus resorted to blackmail -- clearly not part of the BDSM lifestyle -- was powerful evidence that Marcus was not motivated by a desire to maintain a BDSM relationship with Jodi, but by a desire to keep her working on his website.

18

Marcus's principal argument regarding this issue is that because Jodi was subjected to violence, in the form of "punishments," throughout her involvement with Marcus, and because punishments are part of the "BDSM dynamic," the jury could not have found that Marcus's use of violence or punishments was intended to cause Jodi to perform labor or services for Marcus, as opposed to being administered as part of Marcus's and Jodi's BDSM relationship. Def. Mot. at 22-23. With respect to the sex trafficking count, Marcus asserts that Jodi "did not testify that a single punishment she endured after October 1999 was administered because she did not participate or perform well with respect to the photographed BDSM activities. Id. at 22. With respect to the forced labor charge, Marcus argues that Jodi testified to only one instance of punishment that related to her labor or services on the website. Id. at 23.

Marcus's argument fails for several reasons. First, the fact that Marcus used violence or punishments during the consensual part of his relationship with Jodi did not preclude the jury from finding that, after the relationship became non-consensual, Marcus's use of violence and punishments was not for the purpose of maintaining their BDSM relationship -- which Marcus knew Jodi no longer wanted to be involved in -- but was for the purpose of making Jodi manage the website and engage in sex acts that Marcus needed to photograph for his website. Second, the fact that Marcus may have had several motives for engaging in violence toward Jodi does not undermine the jury's verdict so long as one of these motives was to compel Jodi's labor. Third, as Marcus acknowledges, the government is not required to show a link between specific acts of violence or threats and particular acts of labor by Jodi. Def. Mot. 23. Rather, it suffices that the evidence at trial proved that Marcus created a climate of fear in order obtain Jodi's labor. Therefore, it was unnecessary for the jury to hear evidence linking specific acts of violence or threats to instances of compelled labor or commercial sex acts. Indeed, the jury reasonably could have concluded that it was the randomness of Marcus's punishments that created this climate of fear. (T 97). (Jodi testifying that she "was always being punished for being disobedient and it could be for no reason at all"). Lastly, Marcus's arguments about punishments ignores the evidence of Marcus's threats to expose Jodi to her family and the media, and his exploitation of her abusive family history, both of which constitute additional proof regarding Marcus's intent to obtain Jodi's labor and services.

The jury's deliberations in this case were painstaking. Over the course of its seven-day deliberation, the jury produced

numerous notes, many of which focused on key factual and legal issues in the case.  For example, the jury requested the testimony of Dr. Moser regarding the checklist used by health care providers to determine if an individual may be in an abusive BDSM relationship.  In another note, the jurors asked whether a list of different activities could constitute labor, including setting up and maintaining websites, HTML coding, writing diaries and posing for pictures.  (T 1428).

In sum, Marcus's arguments merely demonstrate that there could be different views of the evidence,[7] but not that the evidence was "'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  Guadagna, 183 F.3d at 130 (quoting White, 673 F.2d at 301).  Where, as here, either of two results, a reasonable doubt or no reasonable doubt, is fairly possible, the Court "must let the jury decide the matter." Taylor, 464 F.2d at 243; Autuori, 212 F.3d at 114.  This result is particularly warranted in this case given the jury's deliberate and careful consideration of all of the legal and factual issues.  Accordingly, the jury's verdict should stand.

C.    The TVPA Applies to Marcus's Conduct

Given that the jury had sufficient evidence to find that Marcus's conduct met all of the elements of forced labor and sex trafficking, there is no basis for Marcus's claim that the TVPA does not apply to him.  Marcus nonetheless argues that the Court should make the extraordinary finding that the TVPA does not apply to him because it was only intended to address international sex trafficking and forced labor, and not "intimate, domestic relationship[s]."  Def. Mot. at 1.  However, there is no basis in the TVPA, its legislative history or the caselaw regarding statutory interpretation that justifies this result.

---

[7]  For example, Marcus argues that, at most, the evidence showed that Marcus's purpose in using violence and threats against Jodi "presumably" was to keep her in the BDSM relationship with him and to satisfy his own desires.  Def. Mot. at 22.

1.   <u>The TVPA</u>

The TVPA was signed into law on October 28, 2000.[8]  <u>See</u> H.R. Rep. 106-1048 (2d Sess. 2001), 2001 WL 67919 (chronology of passage of TVPA).  Six criminal statutes, including 18 U.S.C. §§ 1589 and 1591, were enacted as part of the TVPA to supplement the existing federal laws prohibiting peonage and involuntary servitude, which date back to the 1940s.  18 U.S.C. §§ 1581-1594. While Congress may have been focused on the problem of international trafficking at the time the TVPA was passed, the TVPA's legislative history reflects Congress's intent that the Act address both domestic and international trafficking, and that a significant catalyst for the legislation was Congress's concern about the sexual exploitation of women and children:

    [SEC. 102](b) FINDINGS.-Congress finds that:

       (1) As the 21st century begins, the
    degrading institution of slavery continues
    throughout the world.  Trafficking in persons
    is a modern form of slavery, and it is the
    largest manifestation of slavery today.  At
    least 700,000 persons annual, <u>primarily women
    and children</u>, are trafficked <u>within</u> or across
    international borders.  Approximately 50,000
    <u>women and children</u> are trafficked into the
    United States each year.

       (2) . . . The sex industry has rapidly
    expanded over the past several decades. It
    involves sexual exploitation of persons,
    <u>predominantly women and girls, involving
    activities related to prostitution,
    pornography, sex toursim, and other
    commercial sexual services</u> . . . .

_____

    [8]  In its discussion of "precursors" to the TVPA, Marcus states that the U.N. Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children (G.P.A. Res. 55/25, U.N. GAOR, 55th Sess, Annex II U.N. Doc. A/55/25 (2000), prompted the passage of the TVPA.  Def. Mot. at 9-10 ("[I]n response to the clear mandate of Article Five of the United Nations Protocol enacted the same year, Congress passed the [TVPA]").  However, this is incorrect.  The TVPA was enacted in October 2000 while the United Nations Protocol was not passed until November 2000.

(4) <u>Traffickers primarily target women and girls</u> . . . .

(6) Victims are often forced through physical violence to engage in sex acts or perform slavery-like labor.  Such force includes rape and other forms of sexual abuse, torture, starvation, imprisonment, threats, psychological abuse, and coercion . . . .

(10) Trafficking includes all elements of the crime of forcible rape when it involves the involuntary participation of another person in sex acts by means of fraud, force or coercion . . . .

(12) Trafficking in persons substantially affects <u>interstate</u> and foreign commerce. Trafficking for purposes of involuntary servitude, peonage, and other forms of forced labor has an impact on the nationwide employment network and labor market . . . .

146 Cong. Rec. H8855-02, 2000 WL 1476449, at 1-8 (emphasis added).  This excerpt from the Conference Report on the TVPA bill, H.R. 3244, also reflects Congress's intent that the Act reach a wide range of sexual exploitation and not just prostitution.

Congress's focus on the protection and rights of women and children was reinforced by its reauthorization of the Violence Against Women Act ("VAWA") as part of the TVPA.  Senator Brownback, noting that the TVPA included, among other things, the anti-trafficking statutes and the reauthorization of VAWA, urged the Senate to pass the bill: "It is a good package of protection for both domestic and international women and children subject to violence.  That is the theme that runs through this set of acts. It is protection for women, protection for children, protection domestically, and protection internationally."  <u>See</u> 146 Cong. Rec. S10164-02, 2000 WL 1509753 at 51-52.  Senator Leahy similarly commented: [The VAWA reauthorization bill] is a particularly appropriate bill to add to this conference report. As the conference report states, "traffickers primarily target women and girls . . . . VAWA II contains a number of important programs to protect women and children in this country, and would complement the goals of this legislation.  <u>Id</u>. at 57; <u>see also</u> H.R. Rep. 106-487(I) (1st Sess. 1999), 1999 WL 1062882 at *3-4

(original House Report regarding H.R. 3244 listing numerous
conferences and declarations relating to women's rights in the
findings section).

More importantly, Congress drafted the forced labor and
sex trafficking statutes to facilitate the prosecution of both
domestic and international activity.  18 U.S.C. §§ 1589-1591.
Significantly, the forced labor statute applied in this case,
Section 1589, has no interstate or foreign commerce requirement,
and can therefore be applied to purely local activity.
Furthermore, when first enacted, Section 1591 only applied to
trafficking activities that affected interstate, and not foreign,
commerce.  18 U.S.C. § 1591 (2001).[9]

During the 2005 Reauthorization of the TVPA, Congress
expressly confirmed the role of the TVPA in combating domestic
trafficking, especially with respect to the sexual exploitation
of minors.  Introducing the legislation in the House, Congressman
Christopher Smith stated:  "This bill would address the
trafficking of American citizens and nationals within the borders
of the United States-which the bill defines as 'domestic
trafficking' . . . . [This bill] would begin the process of
developing a comprehensive strategy to prevent the victimization
of U.S. citizens and nationals through domestic trafficking."
151 Cong. Rec. E269-02, 2005 WL 38813, at 3.

The TVPA 2005 Reauthorization bill, H.R. 972, reflected
the shift in emphasis to domestic trafficking:

SEC. 2. FINDINGS.

Congress finds the following:

. . . . (4) Trafficking in persons also
occurs within the borders of a country,
including the United States.

(5) No known studies exist that quantify the
problem of trafficking in children for the
purpose of commercial sexual exploitation in
the United States.  According to a report
issued by researchers at the University of
Pennsylvania in 2001, as many as 300,000

_____

[9]  Foreign commerce was added to Section 1591 as part of the
2003 reauthorization of the TVPA.  H.R. Rep. 108-264(I), 2003 WL
22067739, at 34.

children in the United States are at risk
for commercial sexual exploitation, including
trafficking, at any given time.

(6) Runaway and homeless children in the
United States are highly susceptible to being
domestically trafficked for commercial sexual
exploitation . . . .

151 Cong. Rec. H11570-01, 2005 WL 3434198, at 2.[10]  The 2005 TVPA
Reauthorization bill also ordered the Department of Justice to
conduct studies to analyze and address "sex trafficking and
unlawful commercial sex acts in the United States," to include "a
description of the differences in the enforcement of laws
relating to unlawful commercial sex acts across the United
States." Id. at 13.

Thus, a complete reading of the TVPA's legislative
history demonstrates that, far from having the singular purpose
of addressing international trafficking, it was intended and
drafted to address all forms of trafficking, domestic and
international, and that it has as a central purpose the
protection of women and children against physical and sexual
abuse and violence.

2.   The Rule of Lenity Is Inapplicable

Despite the absence of anything in the TVPA's
legislative history or its provisions suggesting that it is
inapplicable to this case, Marcus invokes the rule of lenity to
argue that the Court should look beyond the unambiguous language
of the statutes to find that the forced labor and sex trafficking
statutes do not apply to his conduct. Def. Mot. at 14-20.  As
Marcus acknowledges, the rule of lenity should only be applied
where there is a "grevious ambiguity or uncertainty" in the
statute. Staples v. United States, 511 U.S. 600, 619 n. 17
(1994) (quoting Chapman v. United States, 500 U.S. 453, 463
(1991)).  See Salinas v. United States, 522 U.S. 52, 66, (1997)
("The rule [of lenity] does not apply when a statute is
unambiguous . . . ."); United States v. Giordano, 442 F.3d 30,

---

[10]   Lehti, M., et al., Trafficking for Sexual Exploitation,
Crime and Justice (2006), 34 Crime & Just. 133, at 1 (noting that
current estimates of human trafficking for sexual exploitation
overestimate the amount of international trafficking and
underestimate the domestic trafficking of minors; estimating that
60-80% of the crime is domestic).

40-41 (2d Cir. 2006) (rule of lenity does not apply where the statute unambiguously applies to the charged conduct); United States v. Jones, 779 F.2d 121, 123 (2d Cir. 1985) (declining to apply rule of lenity where the terms of the statute were unambiguous).[11]  Here, there is no such ambiguity or uncertainty to warrant application of the rule.

The unambiguous language of each statute applies to Marcus's conduct:

> 18 U.S.C. § 1589(1)
> Whoever knowingly provides or obtains the labor or services of a person . . . by threats of serious harm to, or physical restraint against, that person or another person [shall be guilty of a crime].

> 18 U.S.C. § 1591(a)
> Whoever knowingly--(1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, or obtains by any means a person . . . knowing that force, fraud or coercion . . . will be used to cause the person to engage in a commercial sex act [shall be guilty of a crime].

See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756 (1975) (starting point in every case involving construction of a statute is the language itself); United States v. Nelson, 277 F.3d 164, 186 (2d Cir. 2002).

In determining whether a statute is ambiguous, "a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit

---

[11]  Marcus cites a 1975 Second Circuit decision, United States v. Rivera, 513 F.2d 519 (2d Cir. 1975), for the proposition that the Court may apply the rule of lenity where, despite the lack of ambiguity in the statute's language, it is nonetheless unclear whether the statute applies to the defendant's conduct.  However, more recently, there has been a gradual limiting of the rule's application to cases where invocation of the rule is necessary to prevent the criminalization of innocent conduct.  See The New Rule of Lenity, 119 Harv.L.Rev. 2420 (June, 2006), at 2428-29

standards for those who apply it." United States v. Strauss, 999
F.2d 692, 697 (2d Cir. 1993).  If the statute is "plain and
unambiguous on its face, a court ordinarily does not look to
legislative history as a guide to its meaning." Tenn. Valley
Auth. v. Hill, 437 U.S. 153, 185, n. 29, 98 S.Ct. 2279, 57
L.Ed.2d 117 (1978); Nelson, 277 F.3d at 186.

     Here, both statutes are clear about what they prohibit.
See United States v. Garcia, 02-CR-110S, 2003 WL 22956917
(W.D.N.Y. Dec. 2, 2003), at *5 (rejecting vagueness challenge to
forced labor statute and finding it clear as to what it
prohibits).  At trial, the evidence established that Marcus
engaged in conduct that was plainly prohibited by these statutes,
namely, the use of violence, threats, coercion, physical
restraint (through a climate of fear) to obtain Jodi's labor and
services, including her work on Marcus's website and
participation in BDSM activities that were photographed and
posted on the website.  Jodi's compelled participation in the
BDSM activities also constituted commercial sex acts for purposes
of Section 1591(a) because Marcus made money from these acts by
posting photographs of them on his website.  The only "ambiguity"
about the application of these statutes in this case was whether
Marcus's conduct was undertaken solely as part of his BDSM
relationship with the victim or for the purpose of obtaining her
labor.  However, this is a factual determination that was
properly made by the jury, and not an issue of statutory
construction.

     Marcus identifies several areas of purported ambiguity
in statute.  First, Marcus argues that the definition of "labor
or services" is overly broad and could encompass domestic chores
performed as part of an intimate, personal relationship.  Def.
Mot. at 17.  Marcus points to the jury's note itemizing a long
list of potential labor and services.  Id.  This issue, however,
is entirely theoretical and does not apply here.  The acts of
labor and services that were the subject of this case were not
chores or activities that are purely incidental to domestic
living arrangements or marriages.  Indeed, the list provided by
the jury included setting up and maintaining a website, HTML
coding, commercial sex acts and posing for pictures -- all of
which are jobs that people do outside the home and for which they
are compensated.  There is nothing in the record that suggests
that Marcus was held accountable for any types of activities that
might not constitute traditional labor or services.[12]

_____

     [12]  Marcus might argue that the jury could have found that
he forced Jodi to engage in sexual activities with him, which

Second, Marcus argues that the terms "serious harm," "physical restraint," "force" and "coercion" from the TVPA cannot be defined by their ordinary meaning where the case involves a consensual BDSM relationship.  Def. Mot. at 17.  However, this issue does not justify the non-application of the TVPA, but merely dictates that these terms be modified to cover only conduct beyond the scope of a consensual BDSM relationship. Since that was done here, Marcus has no grounds for complaint.

Third, Marcus argues that it is unclear in the BDSM context, whether the jury must find, with respect to the aggravated sexual assault enhancement for the forced labor charge, that the assault was committed for the purpose of obtaining the victim's labor or services, or to create a climate of fear.  However, here, the Court properly instructed the jury that it had to find that Marcus obtained Jodi's labor and services through the use of aggravated sexual assault.  (T 1271). Furthermore, it is almost nonsensical to suggest that the jury would be instructed that the assault had to be used to create a climate of fear, since (1) that concept is subsumed under the element of obtaining the victim's labor, and (2) it is not, in itself, an essential part of the crime, but simply one of many means by which a person might violate the statute.  Thus, it would be improper to instruct the jury in this manner.

Lastly, Marcus argues that the term "commercial sex act" could be construed to include all sexual acts that a defendant profits from, even if they occur within the scope of an intimate relationship.  Def. Mot. at 17.  There is no ambiguity on this issue in the statutes.  The TVPA provides no exception for commercial sex acts that are obtained by defendants who also have personal relationships with the victims.[13]  Where, as here, such a situation exists, the issue is a factual one, namely,

---

would be akin to rape or domestic abuse, and not labor.  However, given that the jury was instructed that the sexual acts that Jodi was forced to engage in had to be commercial in nature and given that there was evidence to support such a finding, this argument should be rejected.

[13]  In fact, a majority of sex trafficking cases that have been prosecuted in this District involved men who forced their wives or girlfriends into prostitution.  See Chuang, J., Symposium: Globalization and the New Politics of Labor, Indiana Journal of Global Legal Studies (Winter 2006), 13 Ind.J.Global Legal Stud. 137, at 155 (noting the link between domestic violence and human trafficking).

whether the defendant's actions were motivated solely by his personal relationship with the victim or were they undertaken for a purpose proscribed by the statute.

Marcus has failed to identify any ambiguity in the forced labor or trafficking statutes that would make application to his conduct unfair. While Marcus raises several theoretical ambiguities about the scope of the statutes, see Def. Mot. at 18-19, the Court need not resolve ambiguities in the statutes that do not apply to this case. Nor would it be appropriate for the Court to find that the TVPA does not apply to Marcus based on hypothetical ambiguities that might arise in other cases. Cf. Garcia, 2003 WL 22956917, at 5 ("[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague even though marginal cases could be put where doubts might arise.") (quoting United States v. Harris, 347 U.S. 612, 618 (1954)). Accordingly, Marcus's conduct is within the plain language of both statutes, and, given that it involved the sexual exploitation of the victim as well as forced labor, it is precisely the type of conduct that Congress sought to regulate through the TVPA.

Furthermore, even assuming arguendo that Marcus's conduct was not specifically contemplated by Congress when it passed the TVPA, that does not render its provisions inapplicable to Marcus. A statute can reach beyond the specific situation that Congress envisioned in drafting the statute if the language employed is broad enough. Smith v. United States, 508 U.S. 223, 239 (1993) (citing United States v. Harris, 959 F.2d 246, 262 (D.C. Cir. 1992)); Union Bank v. Wolas, 502 U.S. 151, 157-58 (1991). See also Jones, 779 F.2d at 123 (rejecting defendant's argument that the "schoolyard statute," which prohibited drug sales within a 1,000 yards of a school and was intended to reduce the risk of drugs being sold to children, should not be applied to him because he sold his drugs to adults inside a bar that happened to be within the 1,000-foot zone).

In sum, under the plain language of the forced labor and sex trafficking statutes, and consistent with the purposes of the TVPA, Marcus's conduct is punishable as charged and convicted. Marcus has failed to point to any genuine issue of statutory construction that warrants the extraordinary remedy of overturning the conviction and finding that his conduct is not covered by these statutes. In reality, the "ambiguity" that Marcus complains of relates to a factual question, namely, whether Marcus's conduct was undertaken solely as part of a consensual BDSM relationship, so as to make the application of the trafficking statutes to him improper. However, the jury has

28

resolved that issue against Marcus based on sufficient evidence and after careful and thorough deliberations. Accordingly, Marcus's Rule 29 motion should be denied.

D.    No New Trial Is Warranted

Marcus alternatively seeks a new trial pursuant to Rule 33 so that the jury can be instructed that it must find that the "dominant" purpose of Marcus's conduct was to obtain Jodi's labor and services. Def. Mot. at 2. Marcus argues that such a requirement is necessary to prevent defendants who are involved in abusive domestic relationships from being prosecuted for that conduct under the TVPA. However, Marcus offers no authority for his extraordinary request that a "dominant purpose" requirement be read into the forced labor and sex trafficking statutes.

Such a measure would be contrary to the language and purposes of the TVPA. As previously discussed, a primary catalyst for the TVPA was Congress's desire to enact strong legislation that protected women and children from physical and sexual abuse and exploitation. Consistent with this goal, the TVPA's provisions were drafted as broadly as possible in order to reach a wide range of sexually-oriented crimes perpetrated against women and children. Imposing a "dominant purpose" requirement that would make it easier for defendants who physically and/or sexually abuse the victims within a domestic relationship to avoid prosecution or conviction under the TVPA would turn this scheme on its head and, perversely, reward the defendants who engage in systemic and long-term abuse of their victims. This clearly was not what Congress intended when it passed the TVPA. Cf. United States v. Miller, 148 F.3d 207, 211 (2d Cir. 1998) (rejecting argument, in Mann Act prosecution, that government must show that the "dominant purpose" of defendant's interstate travel was to promote prostitution or other criminal sexual activity). Furthermore, unlike cases where a dominant purpose requirement might reduce the risk of a defendant being improperly prosecuted for innocent conduct, here, the other conduct at issue, i.e., abusing one's spouse, is potentially criminal conduct. Given that Marcus has provided no authority or basis for implementing these extraordinary measures -- ordering a new trial and imposing an additional proof requirement -- Marcus's request must be denied. See v. Locascio, 6 F.3d at 949 (authority to grant a new trial exercised only in the most extraordinary circumstances.)

<u>Conclusion</u>

For all of the foregoing reasons, Marcus's motions pursuant to Rule 29 and 33 for a judgment acquittal or, in the alternative, a new trial should be denied.

Respectfully submitted,

ROSLYNN R. MAUSKOPF
United States Attorney

By: _____
Pamela K. Chen
Assistant U.S. Attorney
(718) 254-7575

Solette Magnelli
Trial Attorney
Department of Justice

cc:  Maurice H. Sercarz, Esq.
     Clerk of the Court (ARR) (via ECF)