# SERCARZ & RIOPELLE, LLP

CARNEGIE HALL TOWER
152 WEST 57TH STREET, 24TH FLOOR
NEW YORK, NEW YORK 10019
(212) 586-4900
FACSIMILE (212) 586-1234
www.sercarzandriopelle.com

ROLAND G. RIOPELLE
MAURICE H. SERCARZ*

———

JULIA L. GATTO
BRUCE SEELIGER*
  *ADMITTED IN NY & NJ

April 27, 2007

<u>*Via ECF & Facsimile*</u>

The Honorable Allyne R. Ross
United States District Court Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>United States v. Glenn Marcus, 05 Cr. 0457 (ARR)</u>

Your Honor:

      The defendant respectfully submits this letter in reply to the government's letter dated April 13, 2007, and in further support of our motions, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, for judgment of acquittal and/or a new trial.

      While we do not waive any of the arguments in our initial submission, in view of the government's response, certain facts and legal arguments require amplification.

**All Of The Conduct For Which The Defendant Was Convicted
Took Place In The Context Of A BDSM Relationship**

      The government's view of the relationship between Marcus and the complainant is based upon a fiction: While the government acknowledges that the complainant willingly joined a BDSM relationship, and that she participated consensually in the relationship for almost one year, the government seeks to argue that once the defendant's conduct went past the point of consent, it was as if the relationship ceased to exist.

      For the purposes of our motions under Rules 29 and 33, we assume *arguendo* that Marcus' conduct toward the complainant crossed the line of consent. But the jury <u>never</u> found that the relationship between Marcus and the complainant ceased to be "intimate and domestic"

The Honorable Allyne R. Ross
April 27, 2007
Page 2 of 9

in nature. (Gov't Letter at p.2). Indeed, <u>all</u> of the evidence established that this was the nature of their relationship throughout.

In its own statement of facts, the government acknowledges that the complainant met Marcus in a BDSM chat room in the fall of 1998. (Gov't Letter at p.4). Between October and December 1998, the complainant traveled to Joanna's home in Maryland on at least two occasions to meet with the defendant and to participate in BDSM activity. (<u>Id</u>.) In January of 1999, the complainant moved to Maryland to live with Joanna and to begin serving the defendant. (<u>Id</u>. at p.5). And, for several months thereafter, the complainant lived with Joanna and served the defendant voluntarily. (<u>Id.</u> at p.5).

Even after the complainant voiced her lack of consent at punishments inflicted by the defendant, the relationship continued within the framework of BDSM. Thus, the government describes the events between October 1999 and the Fall of 2001 under the title "Jodi's Compelled Participation In <u>BDSM Activities.</u>" (Gov't Letter at p.9; emphasis supplied).

Finally, the government acknowledges that even after the complainant moved out of Rona's apartment in the Fall of 2001 and the defendant ceased to be violent toward her, the relationship continued and maintained its sexual content. (<u>See</u> Gov't Letter at p. 12).

In its recitation of the facts, the government suggests that when Jodi agreed to join the relationship, she was anticipating it would take the form of those BDSM relationships with which she had prior experience. (<u>Id</u>. at pp.3-4). This ignores the evidence regarding what transpired during the complainant's visits to Joanna's home in Maryland in October and December of 1998. (<u>Id.</u> at p.4). It also ignores the content of the petition that the complainant filed in order to be permitted to enter into the relationship:

> I am begging you please allow me to be your slave …If you permit me to be your slave I will obey you without hesitation and with complete joy and gratitude. If I fail to do this, I will beg you to punish me and be grateful for whatever you deem appropriate. <u>I am begging to serve you Sir completely, with no limitations.</u>

(TR-271)(emphasis supplied).

During the defense case, Dr. Charles Moser, who testified as an expert on BDSM, explained, without contradiction, that in an unlimited or total power exchange relationship, the submissive "voluntarily decides that they want all of the power to be transferred to the … the dominant partner …[t]herefore, they want the person, the dominant, to control and make all of the decisions." (TR-881).

The government also ignores the role of punishment in BDSM relationships. The complainant acknowledged that during the consensual portion of the relationship, punishment was part and parcel of the sexual aspect of the relationship. The complainant acknowledged that

the punishments were sexually gratifying (TR-90) and that the punishment qualified as either foreplay or sex itself. (TR-277).

Dr. Moser explained the role of punishment in BDSM, in pertinent part, as follows:

> … Some people find that punishment to be arousing. In some cases, it is because the person is aroused by the punishment, by the spanking. In some cases, the person is not aroused by the spanking, but they are aroused by the fact that the person can actually make them do what they want. So it is the exchange of power that is the actual arousal part. And in some cases the punishment is – the actual spanking is not arousal at all but reinforces the roles that they have adopted; they have adopted voluntarily.

(TR-848).

In concluding its recitation of the facts, the government adopts Dr. Moser's formulation that the difference between sadomasochism and domestic violence is consent. (Gov't Letter at p.13). We agree, wholeheartedly, that when a total power exchange relationship goes past the point of consent, the result can fairly be described as domestic violence. And, for purposes of the defendant's motions, we must assume *arguendo* that defendant's conduct crossed the line of consent. However, this leaves open the issues (1) whether the slave trafficking and forced labor statutes are meant to proscribe this sort of domestic violence; and (2) whether, even assuming that under certain circumstances, the statutes might apply, there was sufficient evidence to support the convictions in this case. We respectfully submit that the answer to both questions is "No."

**The Rule Of Lenity Requires That Counts One And Two Be Dismissed**

In view of the government's mischaracterization of our argument, certain obvious concessions must be made at the outset. First, we do not suggest that the statutes apply only in cases where the victim was transported across an international border. While the legislative history clearly establishes that the TVPA was meant to help eradicate a problem that is international in scope, it is clear that 18 U.S.C. §§ 1589 and 1591 prohibit domestic conduct. Second, we do not dispute that the statutes apply to non-sexual forms of labor. We readily acknowledge that the forced labor statute (18 U.S.C. § 1589) extends to a broad variety of labor and services. However, an examination of the legislative history makes it clear that the statutes were intended to proscribe conduct which compels the victim to provide (a) labor or services, or (b) a commercial sex act <u>for a business purpose</u>. Indeed, 18 U.S.C. § 1591, The Sex Trafficking Statute, limits its reach to conduct "in or affecting interstate or foreign <u>commerce</u>," 18 U.S.C. § 1591 (a)(1)(emphasis supplied), and punishes only conduct which compels <u>commercial</u> sex acts. <u>Id</u>. By the same token, the forced labor statute, 18 U.S.C. § 1589, would drastically alter the

The Honorable Allyne R. Ross
April 27, 2007
Page 4 of 9

balance between federal and state authority and would not vindicate any established federal interest unless the statute were limited to instances where the labor or services were truly commercial in nature.

The government does not quarrel with our recitation of the relevant legislative history. In a footnote, the government notes only that the U.N. protocol to prevent, suppress and punish trafficking in persons, especially women and children, was enacted in November of 2000 while the TVPA was enacted in October of 2000. (Gov't Letter at p.21, n.8). This does not undermine our assertion that the TVPA was enacted in response to the clear mandate of Article Five of the United Nations Protocol which called on member nations to criminalize "trafficking in persons." See Defense Letter at p. 9. To the contrary, the fact that the two statutes and the U.N. Protocol were enacted almost simultaneously reinforces the conclusion that the TVPA was meant to be part of an international effort to eradicate slave trafficking. (The fact that the United Nations Protocol was enacted weeks later, speaks only to the pace at which legislation is enacted in the United States Congress, as opposed to the General Assembly).

Nor does the government dispute our description of the rule of lenity. The government, rather, suggests that there is no need to resort to this rule of statutory construction because the language of the statute is clear. This ignores the cases, cited in our letter, that apply the rule of lenity even when the language of the statute appeared, on its face, to be unambiguous. See Williams v. United States, 458 U.S. 279 (1982); and United States v. Rivera, 513 F.2d 519 (2d Cir. 1975). Moreover, as we pointed out in our initial submission, the government's effort to apply these statutes to domestic violence in a BDSM context calls into question the meaning of the terms "serious harm" and "physical restraint" contained in 18 U.S.C. §1598. Moreover, in considering the application of the aggravating element, that "the violation includes…aggravated sexual abuse or the attempt to commit aggravated sexual abuse…" there is a serious question whether it is necessary to demonstrate that the abusive conduct was undertaken with the express purpose of obtaining the labor or services. These are not, as the government suggests, "entirely theoretical" questions. (Gov't Letter at p.26).

The government then argues that recent cases have applied the rule of lenity only when the broader reading of the statute would proscribe a range of "innocent" conduct. (Gov't Letter at p.25, n.11). Yet, we submit that this would be precisely the result if the aforementioned provisions of the TVPA were applied to what are really cases of domestic violence.

In United States v. Kozminski, 487 U.S. 931 (1988), the United States Supreme Court upheld the application of the rule of lenity under circumstances that have a great deal of persuasive authority here. Kozminski involved the scope of two criminal statutes enacted by Congress to enforce the Thirteenth Amendment. Title 18 U.S.C. § 241 prohibits conspiracy to interfere with an individual's Thirteenth Amendment right to be free from "involuntary servitude." Title 18 U.S.C. § 1584 makes it a crime knowingly and willfully to hold another person "to involuntary servitude." In Kozminski, the defendants were charged with abducting mentally retarded adults forcing them to work on the defendant's farms seven days a week, often 17 hours a day, at first for $15 per week and eventually for no pay. United States v. Kozminski, 487 U.S. at 935. In order to prevent their victims from leaving the farm, the defendants

subjected their victims to physical and verbal abuse and instructed their other employees to do the same. On one occasion, one of the defendants threatened one of the victims with institutionalization if he did not do what he was told. In addition, the Kozminskis failed to provide their victims with adequate nutrition, housing, clothing or medical care. Id. at 935.

In its instruction to the jury, the district court in Kozminski defined the term "involuntary servitude" to include not only situations in which persons are physically restrained or forced to return to employment by operation of law, but also to include other forms of coercion as well. Id. at 937. The Court of Appeals sitting *en banc* reversed the conviction concluding that the district court's definition of involuntary servitude would bring cases involving general psychological coercion within the reach of the statutes and was therefore too broad. Id. at 937-38. In upholding the decision by the Circuit court *en banc,* the Supreme Court held:

> The government has argued that we should adopt a broad construction of "involuntary servitude" which would prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power of choice. Under this interpretation, involuntary servitude would include compulsion through psychological coercion as well as any other type of speech or conduct intentionally employed to persuade a reluctant person to work.
>
> This interpretation would appear to criminalize a broad range of day to day activity.
>
> Moreover, as the government would interpret the statutes, the type of coercion prohibited would depend entirely upon the victim's state of mind. Under such a view, the statutes would provide almost no objective indication of the conduct or condition they prohibit, and thus would fail to provide fair notice to ordinary people who are required to conform their conduct to the law.

Id. at 949-50. (Emphasis supplied).

In this case, as in Kozminski, the government's broad reading of the statute would subsume within it "a broad range of day to day activity." As we argued in our initial submission, the government's reading would proscribe virtually every relationship marked by domestic violence if one of the goals of the violence was to cause the victim to remain in the relationship. This is true because virtually every shared living arrangement contains elements that meet the broad definition of labor or services suggested by the government.

While the conduct in this case cannot be described as "innocent" or "day to day" neither can the conduct in Kozminski. Clearly, the abduction of mentally retarded men in order

The Honorable Allyne R. Ross
April 27, 2007
Page 6 of 9

to work under onerous conditions for little or no pay does not fall within the paradigm of "innocent" conduct.  Nevertheless, the Supreme Court recognized that the broad definition of "involuntary servitude" applied by the district court brought within its ambit conduct which – while not "innocent" – went beyond the scope of conduct which the statute was designed to proscribe.  The same is true in this case.

**The Evidence Was Legally Insufficient To Sustain A Conviction
On Either Of The First Two Counts Of The Indictment**

  The government has created what, under ordinary circumstances, would be a compelling narrative linking the acts of violence and physical restraint perpetrated by the defendant to his efforts (1) to have the complainant engage in commercial sex acts; and (2) to obtain her labor and services.  This narrative, however, overlooks entirely the role of BDSM in the relationship between the defendant and the complainant.

  First, the complainant, herself, acknowledges that she willingly submitted to acts of violence and physical restraint at the outset of the relationship.  Second, the complainant goes further and acknowledges that this conduct provided sexual gratification both for her and the defendant – certainly during the period when the relationship remained within the bounds of consent.  Third, the complainant's petition demonstrates that the relationship envisioned by the two parties was one in which the complainant willingly surrendered all of her authority to make every day decisions to the defendant – including decisions regarding work responsibilities and the apportionment of money.

  Under these circumstances, it becomes impossible to determine whether the defendant imposed acts of punishment upon the complainant (a) for a purely sexual purpose; (b) in order to reestablish his authority and control in all aspects of the relationship as agreed upon; or (c) for the prohibited purpose of compelling labor, services or a commercial sex act.

  The government notes in its recitation of the facts that as the relationship between the defendant and the complainant went on, the "punishments" became increasingly more "brutal, frequent and <u>random</u>." (Gov't Letter at p. 6; emphasis supplied).

  During the October 1999 incident, while awaiting "punishment" from the defendant, for a perceived infraction entirely unrelated to labor, services or a commercial sex act, the defendant had sex with the complainant while she was restrained.  (Gov't Letter at p.7).

  And, on the <u>only</u> occasion when the complainant linked punishment to her failure to "work" in accordance with the defendant's standards, the "punishment" was, once again, sexual in nature.  During that incident, in which Marcus allegedly pierced Jodi's labia with a safety pin, Jodi engaged in sexual activity with Rona.  (Government's Exhibit 2B, pp. 1861-1872). (emphasis supplied).

The Honorable Allyne R. Ross
April 27, 2007
Page 7 of 9

Finally, the government acknowledges that the labor, service, or "commercial sex act" which resulted from the "punishment" imposed by Marcus was, typically, a sexual encounter between the defendant and the complainant that was photographed for posting on the website:

> This punishment, however, was no longer part of the consensual, mutually satisfying BDSM relationship that Jodi had originally entered into, <u>but was used by Marcus to force Jodi to comply with Marcus' increasingly more selfish demands to engage in sexual activity</u> that Marcus could photograph for his website.

(Gov't Letter at p.9) (emphasis supplied).

In short, under the unique circumstances present in this case, it simply was impossible for the jury to determine whether defendant's decision to "punish" Jodi was the product of a desire to engage in sexual activity with her or the desire to obtain a benefit on account of their sexual activities.

In order to obtain the defendant's conviction under 18 U.S.C. § 1591 (The Sex Trafficking Statute), the government had to prove beyond a reasonable doubt *inter alia* that the defendant knowingly <u>employed force, fraud or coercion to compel</u> the complainant to engage in a commercial sex act. By the same token, in order to sustain the jury's verdict under the 18 U.S.C. § 1589 (Forced Labor Statute), the government had to prove beyond a reasonable doubt, *inter alia*, that the defendant <u>obtained complainant's labor or services by knowingly threatening</u> serious harm or physical restraint <u>or by otherwise causing the complainant to believe</u> that if she did not work on the website, serious or physical restraint would result.

We submit that no rational trier of fact could have found that the government succeeded in establishing these elements beyond a reasonable doubt.

**In The Alternative, The Defendant Should Be Granted A New Trial At Which The Jury Should Be Instructed That In Order To Sustain A Finding Of Guilt, The Jury Must Find That One Of The Dominant Purposes Of The Violence Or Threats Employed By The Defendant Was To Obtain The Labor Or Commercial Sex Act**

In its answering papers, the government cites to <u>United States v. Miller</u>, 148 F.3d 207 (2d Cir. 1998) (Gov't Letter at p.29) for the proposition that the jury was properly charged (Gov't Letter at p.29). In fact, we submit that <u>Miller</u> lends support to the notion that such a charge should have been given in this case.

In <u>Miller</u>, the defendant appealed from his conviction, following a jury trial in United States District Court for the Southern District of New York (Rakoff, J.) for coercing travel 18 U.S.C. § 2422 and transporting minors (18 U.S.C. § 2423 (a)) in interstate commerce and for purposes of prostitution or other criminal sexual activity. At the time of his conviction, 18 U.S.C. § 2422 read as follows:

> Whoever knowingly…coerces any individual to travel in interstate…commerce…to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense shall be fined…or imprisoned not more than five years, or both.

18 U.S.C. 2423 (a) read:

> A person who knowingly transports any individual under the age of 18 years in interstate…commerce…with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined…or imprisoned not more than ten years, or both.

During the trial, the defense sought an instruction that in order to convict, the jury had to find that the dominant purpose for defendant's trip from Chicago to New York was to have the alleged victims engage in prostitution or other criminal sexual conduct. The District Court rejected the argument relying on United States v. Sirois, 87 F.3d 34 (2d Cir.) cert denied 519 U.S. 942 (1996). The Sirois court held that a defendant may be convicted as long as the forbidden purpose was one of the dominant motives. Sirois, 87 F.3d at 39. Guided by Sirois, Judge Rakoff instructed the jury that:

> The government must prove that it was part of the defendant's conscious purpose in transporting these minors across state lines to have one or both of them engage in prostitution or other criminal sexual conduct. It need not have been his only purpose or motivation, but it must have been more than merely incidental; it must have been one of the dominant purposes of the trip.

While Court of Appeals in Miller ruled that the defense request was precluded by Sirois, the case is material to our motion in two respects:

First, the Court of Appeals in Sirois and the District Court in Miller engrafted onto the statute the requirement that the proscribed result of prostitution or other criminal sexual conduct must be "one of the dominant motives and not merely an incident" of the travel of the interstate commerce. Second, while in our initial submission we argued that the jury should have been instructed that it must have been defendant's dominant purpose to compel the commercial sex act or the labor, the defendant would have benefited from an instruction indicating that it could only convict in this case if it found beyond a reasonable doubt that <u>one of the dominant</u>

The Honorable Allyne R. Ross
April 27, 2007
Page 9 of 9

<u>purposes</u> of the defendant's abusive conduct was to force the complainant to engage in a commercial sex act or to obtain her labor or services involuntarily.[1]

**Conclusion**

      For all the reasons set forth herein and in the defendant's original moving papers, the defendant respectfully submits that the Court should reverse the jury's finding of guilt on the first two counts of the Indictment and dismiss these counts; or in the alternative, grant him a new trial.

      Respectfully yours,

      /S/

      Maurice H. Sercarz

cc:    AUSA Pamela Chen

---

[1] At trial, the jury was instructed simply that to find defendant guilty they must find beyond a reasonable doubt that: "the trafficking activity was undertaken <u>for the purpose</u> of causing a person to engage in a commercial sex act" (Count One, Tr. 1261)(emphasis supplied) and that "the defendant threatened serious harm to or physical restraint against a person, or engaged in a scheme or plan intended to cause the person to believe that non-performance would result in serious harm or physical restraint, <u>for the purpose</u> of obtaining labor or services, and that he thereby obtained labor or services," (Count Two, Tr. 1270)(emphasis supplied).