# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and
Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

August 25, 2011

The Honorable Allyne R. Ross
U.S. District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: <u>U.S.A. v. Glenn Marcus, 05-CR-457 (ARR)</u>

Your Honor:

This letter is submitted on behalf of Mr. Marcus for his re-sentencing on the charge of forced labor, a violation of 18 U.S.C. §§1589(1) and (2). This charge is count two of the above-captioned indictment.

As the Court will recall, Mr. Marcus was convicted of counts one and two of the above-captioned indictment after trial. Mr. Marcus appealed his conviction and sentence to the Second Circuit. The Second Circuit vacated his convictions on both counts. United States v. Marcus, 538 F. 3d 97 (2d Cir. 2008). The Government then appealed the Second Circuit's decision to the Supreme Court. The Supreme Court reversed the Second Circuit's judgment and remanded the case to the Second Circuit to consider whether the error in the case satisfied the "plain error" standard. United States v. Glenn Marcus, 130 S.Ct. 2159 (2010). The Second Circuit considered the convictions in light of the plain error standard and affirmed Mr. Marcus' conviction on count two, but vacated his conviction with respect to count one, the charge of sex trafficking. The Second Circuit directed the District Court to reconsider Mr. Marcus' sentence if the Government decided not to retry Mr. Marcus on the sex trafficking charge. United States v. Marcus, 628 F. 3d 36, 45-46 (2d Cir. 2010). In a letter dated June 16, 2011, the Government informed the Court that it intends to dismiss count one of the indictment at the time of sentencing on count two.

We respectfully request that the Court downwardly depart from the sentencing guidelines or impose a non-guideline sentence to reflect Mr. Marcus' family responsibilities with respect to his mother, his physical condition, his more than five years on strict home confinement as of September 2011, and his 16 months in federal custody. We respectfully request that the Court consider a sentence of time served and five years of supervised release, with continued home confinement as a condition of supervision. We believe that this is a sentence sufficient, but not greater than necessary, to achieve the goals of sentencing.

## I. The factors to consider in determining sentence.

Pursuant to the holding of United States v. Booker, 543 U.S. 220 (2005), the Court is now required to consider all of the sentencing factors enumerated in 18 U.S.C. §3553(a). 18 U.S.C. §3553(a) requires the Court to impose a sentence sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in §3553(a)(2).

### 1. 18 U.S.C. §3553(a)(1).

Pursuant to this factor, the Court is required to consider the nature and circumstances of the offense and the history and characteristics of Mr. Marcus

#### A. The nature and circumstances of the offense.

The nature and circumstances of the offense were fully discussed and briefed at the prior sentencing. We join in Mr. Sercarz' prior sentencing letters of August 14, 2007, August 17, 2007, and August 23, 2007, with respect to these issues.

#### B. The history and characteristics of Mr. Marcus.

Again, Mr. Marcus' personal history was addressed in the prior sentencing submissions, and we join those submissions with respect to Mr. Marcus' history and characteristics prior to the first sentencing. We will address here the changes that Mr. Marcus has undergone since his first sentencing.

Mr. Marcus was remanded at sentencing, September 7, 2007, to begin service of the nine year prison sentence imposed by the Court. Mr. Marcus was designated to Fort Dix for service of his sentence. Mr. Marcus' health seriously deteriorated while he was in custody. As his doctor, David Grossman, writes in his letter of May 18, 2011, Mr. Marcus suffered from dyspnea, or shortness of breath, that the doctor believes was suggestive of a degree of heart failure, leg edema, or fluid collection and swelling in the legs, that is also associated with heart failure, and his need to use nitroglycerin. Mr. Marcus' family and friends relate in their enclosed letters that Mr. Marcus was constantly short of breath, suffered from terrific swelling in his legs and ankles, and eventually found it too difficult to come to the visiting room at the jail to see friends.

Mr. Marcus was released on bail pending appeal after the Second Circuit's decision vacating his convictions on January 7, 2009. Upon his release, Mr. Marcus' family and friends found him to be a changed man both physically and psychologically. While both Mr. Marcus' health and psychological outlook improved over the months after his release, he has suffered setbacks in both this Spring. Mr. Marcus' father died in March 2011. His unexpected death was an emotional blow to Mr. Marcus, and an even greater blow to Mr. Marcus' mother, Belle. Mr. Marcus has had to deal with his own grief while trying to help his mother overcome her anguish, anxiety, and depression over the loss of her husband. All of the letters sent on Mr. Marcus and his mother's behalf comment on the grief that Belle Marcus is going through, and the fact that Mr. Marcus is the one Belle is relying on to get through this most difficult period of her life.

In addition to her emotional difficulties, Belle's physical frailty has increased. Since the death of her husband her problems with her knees have worsened. While surgery and knee replacement would be the ordinary course of treatment, her doctors are unsure she could survive the surgery.

Mr. Marcus' physical health also became uncertain this Spring. In addition to his history of emphysema, hypertension, and coronary artery disease, Mr. Marcus was hospitalized on July 13, 2011 and scheduled for an emergency operation because doctors believed that he had a gall stone lodged in his bile duct. After additional testing, the doctors decided not to operate, but during the testing learned that Mr. Marcus now had diabetes, possible liver disease, and cholithiasis, a condition that leads to the formation of gall stones. The doctors so far have been unable to get Mr. Marcus' diabetic blood sugar levels under control, and continue to observe his other blood analyses to determine what is happening with respect to his liver and gall stone creation.

Finally, Mr. Marcus' maternal aunt, Faith Vertun, moved in with her sister and Mr. Marcus this summer. Ms. Vertun is currently suffering from terminal lung cancer that has metastasized into her bones. Please see exhibit S. She was living alone in Brooklyn, but was unable to care for herself and so moved in with Mr. Marcus and his mother. Ms. Vertun is currently undergoing chemotherapy, which the doctors hope will improve her life expectancy and her quality of life. Her moving into the household is another cause of difficulty, anxiety, and depression to Belle Marcus. Belle has the additional difficulty of trying to care for her sister. Ms. Vertun is bedridden for the most part, and needs assistance in getting in and out of bed, dressing, bathing, using the bathroom, and visiting the doctor. While Belle tries her best to aid her in her personal activities and take her sister to the doctor, she is herself too frail to help her sister in and out of bed or up and down stairs. Both Belle and Ms. Vertun rely on Mr. Marcus to help with these activities. On several occasions, Ms. Vertun has fallen, and had Mr. Marcus not been at home, Ms. Vertun would have needed an ambulance called to get her back into bed because Belle could not manage it.

Belle is also having difficulty dealing with the emotional impact of her sister's terminal diagnosis. Mr. Marcus has tried to get his mother to recognize the need for hospice or home health care for her sister, but Belle does not seem to be able to focus on these facts or act and arrange for the care her sister needs. Mr. Marcus is doing his best to remind her and to make arrangements, but Belle's depression is preventing her from acknowledging the seriousness of the situation and getting these things done.

2. **18 U.S.C. §3553(a)(2).**

The Court is next required to consider the following four factors in determining the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational, or vocational training, medical care, or other correctional treatment in the most effective manner.

### A. A sentence to reflect the seriousness of the offense.

The jury found Mr. Marcus guilty of forced labor achieved through facts that constituted aggravated sexual abuse. This is a very serious offense. The Court took notice however, at the original sentencing, that this case fell outside the heartland of the guidelines because of the involvement of Mr. Marcus and the victim in an alternative lifestyle that blended sex and violence. At the original sentencing, the Court felt that a substantial period of imprisonment was required because of the cruelty of the offense, however, we believe that an alternative sentence can also reflect the seriousness of the offense.

Mr. Marcus suffered a great deal during his period of incarceration. The effects on his health demonstrated that a period of incarceration for him was much more harsh and severe than for an ordinary defendant. That this might be the case was a mitigating fact noted by the Probation Department in ¶135 of the Presentence report, and it was borne out during Mr. Marcus' period of incarceration. Given that incarceration is much more harsh and severe for Mr. Marcus than the ordinary inmate, a five year period of supervised release with home confinement would reflect the seriousness of the offense, but still provide just punishment for the offense. It would also promote respect for the law by demonstrating that the Court and the law take into consideration the actual, demonstrated effects of incarceration in determining an appropriate sentence.

### B. A sentence to adequately deter criminal conduct.

The sentence requested will still provide general deterrence for the offense, given that its leniency would be based on Mr. Marcus' individual family responsibilities and his individual physical condition, rather than any view that the conduct he was convicted of should be treated lightly. The addition of home confinement to Mr. Marcus' supervised release will demonstrate the seriousness of the sentence imposed, especially given that it would come after an initial period of five years of home confinement and 16 months in custody.

### C. A sentence to protect the public from any future crimes on the part of Mr. Marcus.

The original conditions of supervised release imposed with the original sentence: that Mr. Marcus undergo mental health treatment and that his use of any internet capable device be limited and monitored; an additional five years of home confinement, and Mr. Marcus' age and health conditions will all protect the public from any future crimes on the part of Mr. Marcus. Mr. Marcus' fear of prison if he violates any condition of his supervision will also act as a deterrent to any wrongdoing on his part and will further protect the public.

### D. A sentence to provide needed educational, vocational, or medical treatment.

Mr. Marcus is not in need of educational or vocational treatment, and as demonstrated by his period of incarceration, he is better able to obtain medical care outside of custody.

### 3. 18 U.S.C. §3553(a)(3).

The Court must next consider the kinds of sentences available. Mr. Marcus is not subject to a mandatory minimum sentence, but this is a class A felony, so all sentencing options are available to the Court except for a term of probation.

### 4. 18 U.S.C. §3553(a)(4).

The Court must next consider the applicable guideline sentence. The Probation Department found Mr. Marcus' total offense level to be 37, his criminal history category to be I, and his recommended guideline range of imprisonment to be 210 to 262 months.

We disagree with this guideline calculation and join Mr. Sercarz' arguments at Mr. Marcus' first sentencing that the guideline enhancements in this case, given the specific facts of this case, constitute impermissible double counting. The rationale for those arguments are set forth in Mr. Sercarz' letters of August 14, 2007, August 17, 2007, and August 23, 2007. We believe that Mr. Marcus' total offense level should be 29, his criminal history category should be I, and his guideline range of imprisonment should be 87 to 108 months.

### 5. 18 U.S.C. §3553(a)(5).

The Court must next consider whether there are any pertinent policy statements issued by the sentencing commission that would affect Mr. Marcus' sentence. We believe that Mr. Marcus would be eligible for a downward departure or a non-guideline sentence because of his family ties and responsibilities and his physical condition. These are both specific offender characteristics considered in Chapter 5, Part H of the sentencing guidelines, and the Introductory Commentary to Part H states that these characteristics "may warrant a sentence outside the applicable guideline range if the characteristic, individually or in combination with other such characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."

#### a. §5H1.6: Family Ties and Responsibilities.

While family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted, the Second Circuit has affirmed the district courts' broad discretion to depart downward for extraordinary family responsibilities, particularly where the families of the defendants are the intended beneficiaries of the departure. United States v. Galante, 111 F.3d 1029 (2d Cir. 1997). See United States v. Johnson, 964 F. 2d 124 (2d Cir. 1992); United States v. Alba 933 F.2d 1117 (2d Cir. 1991). Here the intended beneficiaries of the departure would be Belle Marcus and to some extent her sister, Faith Vertun.

As noted in the doctors' letters enclosed as exhibit A, Belle Marcus suffers from hypertension, diabetes, and arthritis. She needs knee replacements in both knees, but her doctors are unsure she would survive the surgery. In addition to her physical ailments, as Dr Levine notes in his letter of May 4, 2011, Belle is also suffering from severe anxiety since the death of her husband. He notes that Belle needs physical and emotional support at this time, and her son

at this point is her only caretaker. In Dr. Levine's opinion, Belle "would suffer greatly without the care and support of her son at home."

In support of that opinion, we have enclosed[1] sixteen letters from friends and family, all discussing the impact the death of Belle Marcus' husband has had on her. Belle Marcus writes

> Since Glenn has been out on bail, he has helped a great deal around the house; taking out the garbage, carrying packages into the house, and many other necessary chores I can no longer manage on my own. I have trouble walking, as I need two knee replacements. Unfortunately, my internist has advised that my health is such that I cannot have this operation, although there is a possibility that I maybe able to some time in the future.
>
> When my husband passed, Glenn had to take me to the cemetery to buy a plot, as we had never purchased one. Glenn handled all the arrangements for these things which I was unprepared to cope with, such as picking out the plot and holding on to me while all the details were arranged for and finalized. He also went to the funeral parlor with me to make arrangements for the burial, as well as contacting an orthodox rabbi to make sure that the Jewish burial traditions and rituals were observed, as he knew his father would have wanted. Without Glenn, I don't know how this would have happened as I would not have had any idea how to handle this.
>
> At the funeral, Glenn stood by me and held me up and not just because of my bad knees. I was totally overcome with grief and Glenn was the only one that could truly console me. There were others supporting me as well, of course, but they are not "my boy", Glenn.
>
> After the funeral I completely fell apart. I have been diagnosed with having anxiety attacks, which leave me feeling weak, dizzy, shaky, and very much afraid, especially of afraid of being alone. Glenn does everything he can do for me. He sits with me, he talks with me, and most importantly, he leaves me alone when I want to be, still knowing that all I need to do is call him on the intercom and he will come running. Exhibit B.

Belle's sister Faith Vertun writes:

> In March of this year, my sister's husband passed away, and she has been despondent and depressed ever since. Her health was not ideal prior to his passing, due to the need for two knee replacements which means her ability to walk is extremely impaired and like our mother before her, Belle, too, suffers from diabetes. And since her husband passed away, to further complicate things, my sister has been subject to frequent anxiety attacks and ongoing deep depression. She doesn't want to leave her bedroom, and doesn't want to go out anymore, which is not like the way she once was, outgoing, active and with many friends who she had spent time with, whose requests to get her to go out to dinner

---

[1] All enclosures will be provided to the Court, the Government, and the Probation Department, but they will not be filed on ECF because of the personal identifiers and the nature of the information they contain.

or a show are now met with a polite, but resolute "no". She says: 'I'm not ready yet, and I'm not sure I ever will be". It is good that Glenn is always there and always was, to comfort her and try to ease her fears. Exhibit C.

Michael Marcus, Mr. Marcus' brother, Crystal Marcus-Kanesaka, his daughter, and Kevin Marcus-Kanesaka, his son-in-law, also detail their mother and grandmother's dependence on Mr. Marcus. Michael Marcus writes:

> Speaking with my Mom, it has become increasingly apparent how reliant she is on Glenn. She dreads the thought of living without him as he has become the primary caretaker for my Mom both physically and emotionally. Glenn has demonstrated a commitment to my Mom that can't be matched. Exhibit D

Crystal Marcus-Kanesaka writes:

> My grandmother, now eighty-something has been married, pregnant or with children since age twenty-two. It is bizarre for her to find herself alone after all this time. Naturally, the family is concerned for her general welfare. I call every couple of days and visit once a week. My uncle calls more and visit less. However, it is my father who takes the laundry down and the packages up. It is my father who takes the garbage out and puts the light bulbs in. It is my father who winds the clocks so they chime, and sets the alarm at night. My grandmother falls asleep in a bright room with the television on. It is my father who turns the lights out and the television off. And my Grandmother is spared the most frightful sound of all, silence. Exhibit E.

Kevin Marcus-Kanesaka writes:

> I haven't seen that twinkle in her eyes since Grandpa's death and she no longer makes those witty remarks I so fondly remember. Those nights that we've spent with her at her home since Grandpa's death, I have heard her crying late at night when she thinks no one can hear her. She cannot sleep in her bedroom without the lights and the television on, for she told me that those things give her some small comfort as she tries to sleep alone in her bed without Grandpa.
>
> As far as I've known Grandma, she's had bad arthritis in both of her knees. And although she may have complained about the pain in her knees from time to time, this never stopped her from taking walks, dancing, or doing her day to day errands. After Grandpa's death, the pain in her knees seems to have crippled her. I know that when we visit her on the weekends, we have to help her in and out of her bed, up and down the stairs in her house and sometimes even to the bathroom.
>
> If there has been one silver lining in this situation, it is the fact that Glenn has been there to help Grandma physically and emotionally. Glenn cleans the house, takes the trash out, carries Grandma's laundry from the second floor to the basement and helps her, in general, to move around in her house. More importantly, though, he's been there on a day-to-day basis to, metaphorically and literally, hold her hand as she is struggling with her grief. I fear that if Glenn is sentenced to prison, she would lose an emotional support

pillar that she needs and leans upon, and which would have a significant repercussion on her well being. Exhibit F.

The other letters from friends and family continue in the same vein, all noting the incredible physical and emotional hardship Mr. Marcus' re-incarceration would wreck on his mother.

While the Court may believe that Belle Marcus' situation could be resolved by her living with her other son or her granddaughter, or even by bringing in home help, my discussions with Belle and her family lead to the conclusion that it could not. Michael Marcus has broached this as an option with her, despite the difficulty it would be for his family, and she has flatly refused. Belle does not want to leave her home or her friends or her familiar surroundings. Given her depression and anxiety attacks, a forced move would likely worsen her emotional and physical health. With respect to home help, Belle is frightened of strangers in the house, and her financial situation is not such that, even if she were comfortable with home help, she would be able to afford the amount of help she needs. The viability of any move is further complicated by the fact that Faith Vertun is now living with Belle, and she would to move as well.

As Roxanne Cohen, Belle's niece writes:

> When my uncle was dying in the hospital, my Aunt Belle confided in me that her only remaining companion and friend was Glenn. She has another son, an adult granddaughter, and a frail sister, but they do not bestow the same warmth and understanding that Glenn provides. Aunt Belle has moved her dependency to Glenn and will not allow anyone (family, friend, or paid worker) to assist. Glenn has been helping her with the myriad of bills, caring for the house, and is the one person that she will allow to nurture her. I am honestly concerned for her well-being if/when Glenn is remanded to prison. Exhibit G.

The letters we have enclosed are in support of Mr. Marcus, and whatever their beliefs about his conviction, all of the individuals writing recognize the need for punishment for Mr. Marcus' conviction. All of them ask the Court, however, to consider an alternative to incarceration that would not wreck havoc on Belle Marcus. During his five years of home confinement, Mr. Marcus has had no violations of release. He has demonstrated he is not a risk of flight and can comply with some of the strictest requirements of home confinement imposed on anyone granted bond. We respectfully request that the Court consider Belle Marcus and her sister, in downwardly departing from incarceration to a period of home confinement on supervised release. The only additional request we would make of the court with respect to home confinement on supervised release, other than the conditions granted as part of the bond[2], is that Mr. Marcus be permitted to take his mother and his aunt to their doctor's appointments, given their ever increasing frailty.

---

[2] The personal conditions of Mr. Marcus' release on home confinement were that he was permitted to attend his own medical appointments, take a walk for an hour once per day, and go to temple once per week.

### b. §5H1.4: Physical Condition.

As noted in this policy statement, physical condition may be relevant in determining whether a departure is warranted. It specifically notes that an extraordinary physical impairment may be a reason to depart downward, as in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

As Dr. Grossman writes, Mr. Marcus suffers from emphysema, hypertension, and coronary artery disease. Dr. Grossman noted a significant deterioration in Mr. Marcus' physical condition while in prison, and recommends that Mr. Marcus not be returned to prison because of the clearly demonstrated deterioration in his medical condition while there. Dr. Levine, in his enclosed letter, confirms several new medical problems that were diagnosed during Mr. Marcus' hospitalization in July 2011, and confirms that Mr. Marcus will be undergoing additional testing to further diagnose and address these conditions. These letters are enclosed as exhibit H.

Mr. Marcus' friends and family write in detail about his physical deterioration while in prison. Susan Lane, a friend of Mr. Marcus who is a nurse, writes that when she visited Mr. Marcus in jail:

> I saw his labored breathing. I saw his pale skin, I saw how he sweated excessively in the heat compared with the other inmates in the visiting room. I even, at times, felt an all too rapid pulse when I held his hand. On several occasions, I saw Mr. Marcus's legs. Those he did show me, and I was shocked at how horridly swollen they had become; his ankles had vanished amidst the vast and swollen expanse that had become his lower leg. He had obvious difficulties walking on such deformed limbs. While he did not allow me to test for edema, I have no doubt that I would have found it. He also reported increased angina pain and went from his pre incarceration highly infrequent use of nitroglycerin to using it on a semi-regular basis in prison. His discomfort from GERD [Gastro-Esophageal Reflux Disease] increased as well, and he complained of having pain after almost every meal. He also reported having four bowel movements a day. Exhibit I.

Crystal Marcus-Kanesaka writes:

> My father was not in the best of health to begin with. His conditions worsened during his time in jail. Although my father was never officially denied his heart medications, the guards were often confused about or late with medication. Consequently, my father often experienced dangerously rapid or slow heart rhythms. It was clear to me in my weekly visits, he was out of breath, retaining water, and suffered sweats. Exhibit E.

Rona Cohen, Mr. Marcus' close friend of many years writes:

> From the frequent visits I had with him at Fort Dix, it was clear that he was deteriorating and that he was not able to modify the factors causing his deterioration. The Glenn I knew before incarceration was typically punctual and almost always in good cheer. When I visited him in prison, over time he began to arrive later and later to the visitor's room - often the last inmate - lethargic in demeanor and drenched in sweat. . .

On one visit, when he crossed his legs, I saw his swollen ankle jutting out from his hiked up trouser pants - only it was not an ankle - it was a "kankle". The shoes which he was issued at Fort Dix further exacerbated his swollen legs, and the compression socks he was issued to alleviate swelling in the lower legs only exacerbated his condition. . .

Towards the end of incarceration he also made mention that because of the physical difficulty walking to and from his dormitory to the visitors room, he thought there may come a time when he would have to reduce if not eliminate visits. During the summer he asked that I not visit due to these difficulties. Even though the visitor's room had air conditioning, it was a temporary respite from the heat and quickly undone by a walk back to his unit. Exhibit J.

Clearly Mr. Marcus' physical condition was dramatically worsened by his incarceration. While he has recovered somewhat since his release from custody, new illnesses have emerged. His diabetes is a serious condition and yet to come under control. His combination of conditions creates an extraordinary physical impairment that can be best treated outside of incarceration.

In short, the combination of Belle Marcus' need for and reliance on her son, as well as his serious physical impairments create a situation where a downward departure to a non-incarceratory sentence is warranted. We respectfully request that the Court downwardly depart to a period of supervised release with home confinement.

### 6. 18 U.S.C. §3553(a)(6).

The Court must next consider the need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct. A sentence below the recommended guideline would create sentencing disparity among other similarly situated defendants, but this disparity would not be unwarranted, given Mr. Marcus' family ties and physical condition.

### 7. 18 U.S.C. §3553(a)(7).

The Court next needs to determine if there are any victims in the case requiring restitution. Restitution was ordered in the original sentence but Mr. Marcus' ability to pay the restitution will be equally limited under either a sentence of custody or home detention.

## II. Conclusion.

We have asked the Court for a considerable reduction in sentence from the nine years originally imposed. We make this request because of Mr. Marcus' mother and Mr. Marcus' physical condition.

The time Mr. Marcus spent in custody before being released on bail pending appeal took its toll on him physically and emotionally. Although I have only quoted from the letters describing Mr. Marcus' physical deterioration, many of them comment on his emotional deterioration as well. While the original sentence imposed on Mr. Marcus was below that

recommended under the guidelines, and while the custodial portion of that sentence he has served so far was relatively short, it has made a deep and marked impact upon him physically and emotionally.

The time that he has spent on bail pending appeal has also marked Mr. Marcus deeply. He has been on strict home confinement since his release, and gone through the emotional turmoil of winning his case on appeal, losing his case in the Supreme Court, and ultimately having one of his convictions reinstated by the Second Circuit. He has spent the months since that reinstatement of his conviction understanding and hanging over him a re-sentencing and likely reinstatement of a lengthy prison sentence.

Finally, Mr. Marcus has gone through the death of his father, the swift deterioration of his mother's emotional and physical health, and now the terminal illness of his aunt. This is not a man who has avoided the consequences of his actions. Mr. Marcus' conviction and the devastation it brought to his father likely contributed to his father's death. This knowledge weighs heavily upon Mr. Marcus. The knowledge that he is the source of uncertainty in his mother's future, that his conviction is what makes her living situation and ultimately her emotional stability so unclear, also haunts Mr. Marcus.

The sentence we are asking for is not a slap on the wrist and is not a negation of the victim's suffering in this case. A total of 10 years of home confinement and 16 months is custody is a significant sentence, and one we believe achieves the goals of punishment and deterrence, but is not greater than necessary to do so. Ultimately our request for a downward departure or non-guideline sentence is a request for mercy at sentencing, and it is a request for mercy where a merciful sentence will make the ultimate difference in his mother's life, his aunt's life, and his personal health.

Respectfully submitted,

Mildred M. Whalen
Staff Attorney
(718) 330-1290

enc.

cc:   Assistant U.S. Attorney Pamela Chen, Esq.
      U.S. Probation Officer Patricia Sullivan
      Mr. Glenn Marcus
      ECF