# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

---

David E. Patton
*Executive Director and
Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

November 7, 2011

The Honorable Allyne R. Ross
U.S. District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: <u>U.S.A. v. Glenn Marcus, 05-CR-457 (ARR)</u>

Your Honor:

This letter is submitted in reply to the Government's September 27, 2011 response to our sentencing letter of August 25, 2011. The Government argues that Mr. Marcus' offense conduct and the psychosexual evaluation support the re-imposition of the original 108 month sentence, and that his heath, his mother's circumstances, and the time he has spent on home confinement do not warrant any additional reduction in sentence. We strongly disagree.

## 1. Dr. Berrill's Psychosexual Evaluation

The Government cites Dr. Berrill's psychological evaluation as a demonstrating that Mr. Marcus shows a lack of remorse, is dangerous, and has a potential for recidivism. Govt. Ltr., pp 6-7. We strongly disagree that these are conclusions one can draw from Dr. Berrill's report.

Dr. Berrill found that there was no evidence in Mr. Marcus' "test results of sadistic, anti-social, or borderline personality features." Psych. Eval. at p. 11. Dr. Berrill further found that "there was no evidence in this examination that Mr. Marcus is suffering from a pronounced disturbance in his thinking or reasoning abilities." Psych. Eval. at p. 13. Dr. Berrill found that owing to Mr. Marcus' narcissism and his interest in B/D and S&M, Mr. Marcus "was unable to accurately judge and/or anticipate the possible response his victim would have with respect to their ongoing sexual relationship and further, his posting of photographs of her involvement in B/D and S&M on the Internet. In many respects, it is his failed judgment which has gotten him into trouble with the authorities." Psych. Eval. at p. 14.

Dr. Berrill does not find Mr. Marcus a danger to the community, *per se*, rather he finds Mr. Marcus at risk because if he engages in B/D and S&M in the future, he could be charged "by someone who has either grown disenchanted with the activities or believes that they are being held against their will and forced to engage in sexual acts which they no longer find acceptable." Psych. Eval. at p. 14. Dr. Berrill finds that the ambiguities surrounding B/D and S&M, in combination with Mr. Marcus' narcissism, impaired judgment, and lack of empathy are what create future risk. Psych. Eval. at pp. 14-15. In fact, Dr. Berrill notes that Mr. Marcus is

not a predator and not someone who views the world from an anti-social perspective. Psych. Eval. at p. 15.

Dr. Berrill's recommendation is for treatment to address Mr. Marcus' narcissism, poor judgment, and limited empathy, but Dr. Berrill does not take a position as to whether that therapy takes place in prison or in the community. The fact that he does not take a position as to where that therapy takes place makes it clear that Dr. Berrill does not find Mr. Marcus to be a *per se* danger to the community, and we strongly disagree that this report demonstrates a need for Mr. Marcus to be incarcerated to achieve punishment, deterrence or protection of the community.

Finally, the Government notes that Mr. Marcus has not "sought out or received" any psychological therapy up to this point. Govt. Ltr. at p. 7. With respect to treatment while in custody, Mr. Marcus was told that he would be referred to a program for sexual offenders during the last 14 months of his sentence. With respect to treatment while on release, the Government could have requested such treatment as part of release either pretrial or pending appeal and did not. With respect to Mr. Marcus voluntarily seeking psychological treatment, he has not, but any decision of his not to participate in psychological therapy up to this point is a demonstration of Dr. Berrill's observation that Mr. Marcus' actions/behavior do not cause him the subjective distress that would make an individual seek treatment. Psych. Eval. at p.14. This does not mean that Mr. Marcus would reject or not benefit from treatment. The fact that Mr. Marcus has not voluntarily participated in treatment so far is more a reflection of his lack of insight, his lack of judgment, and his lack of income, rather than any "dangerousness" or "potential for recidivism."

## 2. Mr. Marcus' Health Issues

The Government claims that Mr. Marcus has not demonstrated that his health conditions deteriorated as a result of incarceration, but rather, as demonstrated by the additional medical problems Mr. Marcus has since developed, that the deterioration of his medical condition was inevitable. The Government also argues that Mr. Marcus' offers no evidence that his medical condition cannot be addressed by the Bureau of Prisons. We strongly disagree with both of these claims.

First, Mr. Marcus' medical condition clearly deteriorated while he was in custody, and that deterioration was compounded by conditions in the prison where he was housed. The lack of air conditioning at the facility made it difficult for Mr. Marcus to move around and exacerbated his edema and his heart condition. His inability to move then contributed to his poor nutrition, because it was easier for him to eat food from the commissary, which he could keep in his cell, rather than walk to meals. His family, friends, and doctor noted this deterioration in his condition while he was in custody and upon his release. While it may be inevitable that Mr. Marcus' medical condition will deteriorate, it is clear that the problems he had while in custody were treatable, giving the appropriate housing. The Bureau of Prisons did not take this into consideration in choosing a facility, and apparently did not treat these conditions, especially the edema and his worsening heart condition.

Second, given the lack of treatment in the Bureau of Prisons for Mr. Marcus the first time he was incarcerated, the assurances provided by the Bureau of Prisons that they could treat him now is of little comfort. The letter from the Bureau of Prisons, provided as exhibit C in

the Government's letter, is a form letter they provide to the Government in any case where the defense raises a concern about the medical treatment a defendant will receive in Bureau of Prisons custody. Please see exhibit A, a redacted copy of the form letter the defense received in a different case.

What is quite telling in this letter from the Bureau of Prisons concerning how they would treat Mr. Marcus in their custody in the future, is that there is no reference as to how they addressed Mr. Marcus' medical condition while he was in their custody in the past. In the second paragraph of the letter, the only paragraph specifically relevant to Mr. Marcus and where the Bureau of Prisons discusses their "awareness" of Mr. Marcus' medical condition, the Bureau of Prisons only discuss Mr. Marcus' medical condition as described in the latest round of sentencing letters. The Bureau of Prisons makes no mention of medical treatment they did or did not provide to Mr. Marcus when he was in their custody for 16 months.

While in Bureau of Prisons' custody, Mr. Marcus had difficulties receiving medications. He was given medications in a 30 day dose, and was only allowed to keep a 30 day dose. When Mr. Marcus needed the prescription refilled, Mr. Marcus had to walk across the prison compound to be given his new prescription. As his edema and heart condition worsened, it became harder and harder for him to make the walk to get his prescription. He would arrive at the pill line out of breath and covered in sweat. When he was finally was seen, Mr. Marcus was often told that the pill line or pharmacy did not have his medication, and would have to come back to the next pill line, which would be the next or a subsequent day. If the medication was missing from the pill line, Mr. Marcus would usually be able to get a new prescription in two or three days. However, on several occasions, when the medication was not in stock in the prison pharmacy, Mr. Marcus went without his medication for two or three weeks. This delay in receiving medication led to a serious decline in Mr. Marcus' health while he was previously in custody.

Despite the assurances in the form letter from the Bureau of Prisons, we can only assume that Mr. Marcus' health would be further negatively affected if he was re-incarcerated given his new medical problems, especially the diabetes. Mr. Marcus' diabetes is not under control, and since his diagnosis he has been required to change medications twice, and dosages of those medications several times. Mr. Marcus is also required to check his blood sugar twice daily. For Mr. Marcus to go a day or two without medication for his diabetes could result hospitalization or death.

Given Mr. Marcus' physical condition upon his release from custody, it is clear that the Bureau of Prisons did not adequately treat his medical problems in the past and cannot be relied to do so in the future if he is re-incarcerated. Given that these medical problems have now been compounded by diabetes and possible liver or gall bladder issues, a period of incarceration will be much more harsh and possibly life-threatening for Mr. Marcus than for the ordinary defendant, and would be a reason for the Court to downwardly depart or sentence Mr. Marcus outside the guidelines.

**3. Mr. Marcus' mother's dependence upon him.**

In addition to the loss of her husband detailed in our original sentencing letter, Mrs. Marcus recently lost her sister, Faith Vertun. Ms. Vertun became ill with cancer, had to move in with Mrs. Marcus because she had no one to care for her, and became bedridden while living with Mrs. Marcus. Ms. Vertun took a turn for the worse, was taken to hospice, and died within a few days. Her death has been devastating to Mrs. Marcus.

While the Government states that Mrs. Marcus is not solely dependant upon Mr. Marcus (Govt. Ltr. at p.11), in reality, she is. Mrs. Marcus' other son lives in Pennsylvania and her granddaughter lives in Tarrytown, New York. Mrs. Marcus' son and his wife have a lifestyle that involves a great deal of business travel, which would leave Mrs. Marcus alone a great deal of the time. Mrs. Marcus' granddaughter, with her husband and two young children, does not have the room to take Mrs. Marcus into her apartment. If Mr. Marcus is incarcerated, the reality is that Mrs. Marcus will go into a nursing home. Given her physical condition, her current state of depression, and her anxiety attacks, it is unlikely she would live there very long.

Mrs. Marcus' "flat refusal" to move is an indication of her age, her depression, and her anxiety attacks. She has lost her husband and her sister, and her depression has affected her relationship with her friends in that she no longer goes to see them, they come to see her. To move Mrs. Marcus to a nursing home or other living situation means she would move to surroundings that are not familiar to her, which would disorient her, and which would further negatively affect her mental health. This move would likely limit the personal contact she could have with her friends, especially if she is moved to a nursing home in Pennsylvania or Tarrytown.

Mr. Marcus is in a unique position to help his mother, care for his mother, and keep her in her home. We believe Mrs. Marcus' circumstances do warrant a departure or non-guideline sentence for Mr. Marcus.

### 4. Mr. Marcus' Home Confinement.

We have asked the Court to consider Mr. Marcus' compliance under the very strict terms of home detention pending trial and post appeal as evidence that a further sentence of incarceration is not necessary to achieve a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing.

The government cites United States v. Edwards, 960 F. 2d 278 (2d Cir. 1992) as support for the proposition that home confinement pending trial or appeal is not punishment. But a review of Edwards shows that the case stands more for the proposition that home detention pending trial is not "official detention" for which a defendant can seek sentencing credit from the sentencing court. Id. at 283. In fact, the Court in Edwards noted that the sentencing commission had not considered whether persons in Mr. Edwards position should receive sentencing credit for time spent on home detention while on bail, and that Mr. Edwards had not asked the Court to consider a downward departure from the sentencing guidelines on this basis. The Court made no comment as to whether or not such a departure would be appropriate. Id. at 284.

In United States v. McIntyre, 2008 WL 4636330 (2d Cir. 2008), the Court noted that the district court was aware that it had the authority to depart from the guidelines for time

spent on home confinement on bail pending appeal, but chose not to so depart. ("The district court's statement at sentencing that 'you don't get credit for home confinement' . . . is fairly understood to comment on the fact that the defendant did not merit such credit, not on the court's authority to award it." **1.)  Clearly this Court has authority to consider the time Mr. Marcus has spent on home confinement and his compliance with the strict terms of his home confinement in determining a sentence within the guidelines, as a departure from the guidelines, or as a non-guideline sentence.

      As noted in our original sentencing letter, Mr. Marcus has been on strict home confinement for approximately five years.  He was placed on strict home confinement after his release on bond on May 16, 2005 and remained on home confinement until his remand on September 7, 2007, a period of approximately 28 months.  Mr. Marcus was then released on strict home confinement as part of bail pending appeal on January 7, 2009, and has been on strict home confinement since then, a period of 34 months.  Mr. Marcus has never violated the conditions of his bond.  We believe that Mr. Marcus' compliance with the terms of his bond demonstrates he will comply with the terms of any alternative to incarceration that the Court imposes, and, in combination with all of the other factors described above, would warrant a downward departure or non-guideline sentence.

      For all of these reasons, we respectfully request that the Court impose a sentence of time already served and five years of supervised release, a special condition of which is strict home confinement for the entire period of supervision.

      Respectfully submitted,

*Mildred M. Whalen*
Mildred M. Whalen
Staff Attorney
(718) 330-1290

enc.

cc:    Assistant U.S. Attorney Pamela Chen, Esq.
       U.S. Probation Officer Patricia Sullivan
       Mr. Glenn Marcus
       ECF